**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Andrew Daulton LEE,
Defendant-Appellant.**

No. 77–3031.

United States Court of Appeals,
Ninth Circuit.

Jan. 2, 1979.

Rehearing and Rehearing En Banc
Denied Feb. 15, 1979.

Kenneth I. Kahn, Los Angeles, Cal., for
defendant-appellant.

David R. Homer, Department of Justice, Washington, D. C., Andrea S. Ordin, U. S. Atty., argued, Los Angeles, Cal., for plaintiff-appellee.

Before HUFSTEDLER and ANDERSON, Circuit Judges, and WALSH,* District Judge.

### J. BLAINE ANDERSON, Circuit Judge:

Appellant Andrew Daulton Lee was indicted under a multitude of espionage charges relating to the obtaining of defense secrets and the sale of these secrets to Russian agents. While he raises several errors on appeal, we find that none require reversal. We affirm his conviction.

* The Honorable James A. Walsh, Senior United States District Judge, District of Arizona, sitting by designation.

1. Boyce has also appealed his conviction. The appeals have not been consolidated.

2. This national defense information related to a covert communications satellite study. These documents were marked "Top Secret—Pyramider" and "Pyramider Technical Notes—Volume II," also marked "Top Secret—Pyramider." These defense documents will be referred to in this opinion as the "Pyramider documents."

3. 18 U.S.C. § 794 in full provides:
"§ 794. *Gathering or delivering defense information to aid foreign government*
(a) Whoever, with intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign nation, *communicates, delivers, or transmits,* or attempts to communicate, deliver, or transmit, to any foreign government, or to any faction or party or military or naval force within a foreign country, whether recognized or unrecognized by the United States, or to any representative, officer, agent, employee, subject, or citizen thereof, either directly or indirectly, any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, note, instrument, appliance, or information relating to the national defense, shall be punished by death or by imprisonment for any term of years or for life.
(b) Whoever, in time of war, with intent that the same shall be communicated to the enemy, collects, records, publishes, or communicates, or attempts to elicit any informa-

## THE INDICTMENT

On January 26, 1977, a twelve-count indictment was returned against appellant, Andrew Daulton Lee, and his codefendant, Christopher John Boyce.[1] Lee was charged in eight of the twelve counts as follows:

*Count One* charged Lee and Boyce with conspiring to transmit national defense information[2] to a foreign nation, to wit: the Union of Soviet Socialist Republics (U.S.S.R.), in violation of 18 U.S.C. § 794(a) and (c).[3] *Count Two* charged defendant Lee substantively with attempting to transmit national defense information to the U.S.S.R., in violation of 18 U.S.C. § 794(a).

*Count Three* charged Lee and Boyce with conspiring to gather national defense information in violation of 18 U.S.C. § 793(g).[4]

tion with respect to the movement, numbers, description, condition, or disposition of any of the Armed Forces, ships, aircraft, or war materials of the United States, or with respect to the plans or conduct, or supposed plans or conduct of any naval or military operations, or with respect to any works or measures undertaken for or connected with, or intended for the fortification or defense of any place, or any other information relating to the public defense, which might be useful to the enemy, shall be punished by death or by imprisonment for any term of years or for life.
(c) If two or more persons conspire to violate this section, and one or more of such persons do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be subject to the punishment provided for the offense which is the object of such conspiracy."

4. 18 U.S.C. § 793 provides in full:
§ 793. *Gathering, transmitting, or losing defense information*
(a) Whoever, for the purpose of obtaining information respecting the national defense with intent or reason to believe that the information is to be used to the injury of the United States, or to the advantage of any foreign nation, goes upon, enters, flies over, or otherwise obtains information concerning any vessel, aircraft, work of defense, navy yard, naval station, submarine base, fueling station, fort, battery, torpedo station, dockyard, canal, railroad, arsenal, camp, factory, mine, telegraph, telephone, wireless, or signal station, building, office, research laboratory or station or other place connected with the national defense owned or constructed, or in

*Count Four* charged Lee substantively, along with Boyce, with actually gathering national defense information (the Pyramider documents), intending, or having reason to believe, that such information would be used to the advantage of the U.S.S.R., all in violation of 18 U.S.C. § 793(b) and (g).

*Count Five* charged Lee with receiving national defense information (the Pyramider documents) from Boyce, knowing, or having reason to believe, that such information had been obtained illegally by Boyce, all in violation of 18 U.S.C. § 793(c). *Count Seven* charged Lee with having unauthor-

progress of construction by the United States or under the control of the United States, or of any of its officers, departments, or agencies, or within the exclusive jurisdiction of the United States, or any place in which any vessel, aircraft, arms, munitions, or other materials or instruments for use in time of war are being made, prepared, repaired, stored, or are the subject of research or development, under any contract or agreement with the United States, or any department or agency thereof, or with any person on behalf of the United States, or otherwise on behalf of the United States, or any prohibited place so designated by the President by proclamation in time of war or in case of national emergency in which anything for the use of the Army, Navy, or Air Force is being prepared or constructed or stored, information as to which prohibited place the President has determined would be prejudicial to the national defense; or

(b) Whoever, for the purpose aforesaid, and with like intent or reason to believe, copies, takes, makes, or obtains, or attempts to copy, take, make, or obtain, any sketch, photograph, photographic negative, blueprint, plan, map, model, instrument, appliance, document, writing, or note of anything connected with the national defense; or

(c) Whoever, for the purpose aforesaid, receives or obtains or agrees or attempts to receive or obtain from any person, or from any source whatever, any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, instrument, appliance, or note, of anything connected with the national defense, knowing or having reason to believe, at the time he receives or obtains, or agrees or attempts to receive or obtain it, that it has been or will be obtained, taken, made, or disposed of by any person contrary to the provisions of this chapter; or

(d) Whoever, lawfully having possession of, access to, control over, or being entrusted with any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, instrument, appliance, or note relating to the national defense, or information relating to the national defense which information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation, willfully communicates, delivers, transmits or causes

to be communicated, delivered, or transmitted or attempts to communicate, deliver, transmit or cause to be communicated, delivered or transmitted the same to any person not entitled to receive it, or willfully retains the same and fails to deliver it on demand to the officer or employee of the United States entitled to receive it; or

(e) Whoever having unauthorized possession of, access to, or control over any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, instrument, appliance, or note relating to the national defense, or information relating to the national defense which information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation, willfully communicates, delivers, transmits or causes to be communicated, delivered, or transmitted, or attempts to communicate, deliver, transmit or cause to be communicated, delivered, or transmitted the same to any person not entitled to receive it, or willfully retains the same and fails to deliver it to the officer or employee of the United States entitled to receive it; or

(f) Whoever, being entrusted with or having lawful possession or control of any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, instrument, appliance, note, or information, relating to the national defense, (1) through gross negligence permits the same to be removed from its proper place of custody or delivered to anyone in violation of his trust, or to be lost, stolen, abstracted, or destroyed, or (2) having knowledge that the same has been illegally removed from its proper place of custody or delivered to anyone in violation of his trust, or lost, or stolen, abstracted, or destroyed, and fails to make prompt report of such loss, theft, abstraction, or destruction to his superior officer—

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

(g) If two or more persons conspire to violate any of the foregoing provisions of this section, and one or more of such persons do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be subject to the punishment provided for the offense which is the object of such conspiracy."

ized possession of national defense information (the Pyramider documents) and attempting to transmit such information to unauthorized persons, to wit: representatives, officers, and agents of the U.S.S.R., in violation of 18 U.S.C. § 793(e).

*Count Ten* charged Lee with acting as an agent of a foreign government (i. e., the U.S.S.R.) without prior notification to the Secretary of State. Finally, *Count Twelve* charged Lee with receiving stolen government property (the Pyramider documents) valued in excess of $100, in violation of 18 U.S.C. § 641.[5]

Lee was found guilty on all counts. Sentences for various terms, including a life sentence on Count Two, were ordered to commence and run concurrently.

## BACKGROUND

■ When we view the voluminous evidence of this case (some 20 volumes of Reporter's Transcript) in the light most favorable to the verdict, as we must, we find that it is amply substantial to support Lee's conviction. Indeed, at page 1 of his reply brief Lee concedes that he transferred documents bearing a "Top Secret" stamp to officials of the Soviet Embassy in Mexico. Due to this large volume of the evidence, the following is a summary of the pertinent facts of this case.

On January 6, 1977, Lee was arrested by Mexican authorities in front of the Russian Embassy in Mexico City, Mexico, when he stuck his head through the Embassy fence and discarded some "trash" from his pockets. Lee was taken to Mexican police headquarters for questioning. When asked to empty his pockets, Lee removed a white four-inch by eight-inch business envelope which contained ten to fifteen strips of photographic film negatives. Pictures made from these negatives were of documents marked "Pyramider" and "Top Secret."

The trial evidence showed that Lee and his codefendant Boyce worked closely together in selling the Pyramider defense secrets to Russian agents and that they split the profits from these sales.

Boyce was an employee for a corporation called TRW, Inc., which performed special studies of secret projects for elements of the United States intelligence community. One such project for the C.I.A. on which TRW worked was the Pyramider project. While Boyce was given a "Top Secret" security clearance by the C.I.A. for other work with TRW, he was never authorized access or clearance to the Pyramider project documents. Evidence was introduced at trial which showed that twenty-five fingerprints of Boyce's were found on Pyramider documents and that one fingerprint of Lee's had been found on a piece of equipment in the communications vault at TRW. The assistant director of security at TRW testified that neither Boyce nor Lee ever had any authorization to handle the files or that piece of equipment.

Evidence was introduced to show that Lee and Boyce were seen numerous times together during the time of Boyce's employment with TRW and that they had made many trips to Mexico City. Lee himself made several trips to Mexico City travelling under an alias. He returned from these trips with "stacks" and "bundles" of money. Upon return, he often went directly to

---

5. 18 U.S.C. § 641 provides:

   "*Public money, property or records*

   Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or

   Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted—

   Shall be fined not more than $10,000 or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.

   The word 'value' means face, par, or market value, or cost price, either wholesale or retail, whichever is greater."

Boyce's residence to split the proceeds. At one point in the sequence one Cameron Adams traveled to Mexico City with Lee. While in Mexico City, Lee took some tape and placed an "X" on certain poles. When Adams asked about this, Lee told him that he was just "involved with a spy thing here" and that the "X" on the poles was "to inform his people [that] he was in town." (R.T. 6:67)

On another occasion, Lee showed one Sabel Shields a Minox camera which he owned and told her that "he was a Russian spy and that this was his espionage camera and that this is what he used to film top secret documents." (R.T. 6:53)

Testimony at trial showed that this type of a Minox camera is used for photographing book pages and documents.

This Minox camera, which had been seen in Lee's possession several times, was seized during a search of Lee's and Boyce's residence. An F.B.I. Special Agent and photographic expert testified that the film negatives of the Pyramider project taken from Lee in Mexico City were produced by Lee's Minox camera.

## LEE'S DEFENSE THEORY

Lee's defense was that he was an employee of the United States Government (the C.I.A.) and that he was working *for* the government by selling misinformation to the Russian agents. Evidence of this theory was very thin. The defense case on this point consisted of the testimony of two F.B.I. agents and the defendant's grandmother.

One F.B.I. agent testified on direct examination that he had interviewed defendant Lee on January 14, 1977, in Mexico City and that Lee had told him that he was connected with the C.I.A. and that he was employed as a subcontractor by the C.I.A. On recross-examination, however, the agent testified that a check made by F.B.I. headquarters had disclosed that Lee was not working for the C.I.A. Another agent also testified that Lee had said he was working for the C.I.A. This agent also stated that Lee's story had been found to be inaccurate.

Myrle Clarke, Lee's grandmother, testified that in the summer of 1976 Lee had told her concerning a trip to Mexico that he was working for the government, but on cross-examination, she stated he had not said for which government he was working.

## ISSUES

On appeal Lee alleges: (1) that the trial court did not adequately instruct the jury on his theory of defense; (2) that the admission into evidence of three affidavits prepared by C.I.A. officials denied him his right to confrontation and were inadmissible hearsay; (3) that denial of his discovery motions was prejudicial to the preparation of his defense; (4) that the trial court improperly limited his expert's testimony; and (5) that the trial court should have held an evidentiary hearing regarding a possible conflict of interest among attorneys.

## DISCUSSION

### (1) *Jury Instructions*

■ Lee contends that the trial court erred when it refused to give a requested jury instruction regarding his employment with the government. The rejected instruction No. 26 reads:

"Unless you are convinced beyond a reasonable doubt that ANDREW DAULTON LEE neither was working for the United States Government, nor had a reasonable belief he was working for the United States Government with regard to the allegations of the Indictment, you must find him not guilty.

"You may only convict ANDREW DAULTON LEE if you are convinced beyond a reasonable doubt that ANDREW DAULTON LEE was not working for the United States Government and that he had no reasonable belief he was working for the United States Government with regard to the allegations of the Indictment. Otherwise you must find him not guilty." (CR 837)

Lee relies on *United States v. Tashman,* 478 F.2d 129 (5th Cir. 1973), as support for his instruction.

In deciding whether it was error for the trial judge to refuse Lee's proposed Instruction No. 26, we are guided by this court's prior decision in *United States v. Kaplan,* 554 F.2d 958 (9th Cir. 1977), *cert. denied,* 434 U.S. 956, 98 S.Ct. 483, 54 L.Ed.2d 315, where we said:

"While it is clear that the trial judge must instruct the jury as to the defendant's theory of the case, the instructions given need not be in the precise language requested by the defendant. *Charron v. United States,* 412 F.2d 657, 660 (9th Cir. 1969); *Rivers v. United States,* 368 F.2d 362, 364 (9th Cir. 1966). The refusal to give a requested instruction is not error 'if the charge as a whole adequately covers the theory of the defense.' *United States v. Blane,* 375 F.2d 249, 252 (6th Cir. 1967), *cert. denied,* 389 U.S. 835, 88 S.Ct. 41, 19 L.Ed.2d 96 (1967), *reh'g denied,* 389 U.S. 998, 88 S.Ct. 459, 19 L.Ed.2d 503 (1967). Thus, the adequacy of the jury instructions is 'not [to] be determined by the giving, or failure to give, any one or more instructions,' but by examining the instructions as a whole. *Beck v. United States,* 305 F.2d 595, 599 (10th Cir. 1962); *United States v. Alvarez,* 469 F.2d 1065, 1067 (9th Cir. 1972); *United States v. Moore,* 522 F.2d 1068, 1079 (9th Cir. 1975), *cert. denied,* 423 U.S. 1049, 96 S.Ct. 775, 46 L.Ed.2d 637."

554 F.2d at 968. *See also United States v. Seymour,* 576 F.2d 1345, 1348 (9th Cir. 1978).

Examining the instructions given to the jury (R.T. 13: 174–13: 245) in the present case, we find that they adequately covered Lee's theory of defense. If the jury had found that Daulton Lee had delivered the information as part of his employment by the C.I.A., then they could not have found that he had the necessary intent as explained in the court's instructions. The trial judge repeatedly explained what intent the jury must find to support a guilty verdict under each one of the counts of the indictment. Additionally, the indictment was read to the jury during the course of the instructions and a copy setting forth the different charges against Lee was given to the jury for use during their deliberations.

Count One of the indictment charged Lee with a conspiracy:

" '[t]o knowingly and willfully communicate, deliver, and transmit to . . . the Union of Soviet Socialist Republics . . . information relating to the national defense of the United States . . . intending and having reason to believe that same would be used to the advantage of . . . the Union of Soviet Socialist Republics, in violation of' the applicable statutes of the United States."

(R.T. 13: 188–189).

Count Two charged Lee:

"with intent and reason to believe that they would be used to the advantage of . . . the Union of Soviet Socialist Republics, did knowingly and wilfully attempt to communicate, deliver, and transmit to . . . the Union of Soviet Socialist Republics . . . (the various Pyramider documents)."

(R.T. 13: 201–202).

Count Three charging Lee with a conspiracy;

" '[f]or the purpose of obtaining information respecting the national defense of the United States, did knowingly and willfully copy, take, make, and obtain (various information connected with the national defense), . . . intending and having reason to believe that same would be used to the advantage of . . the Union of Soviet Socialist Republics, in violation of' the applicable provisions of the law. . . ."

(R.T. 13: 211).

Count Four charged Lee with the substantive offense underlying Count Three (R.T. 13; 214).

Count Five charged Lee with receiving the "Top Secret Pyramider" documents, " 'knowing and having reason to believe that same had been obtained, taken, and made by CHRISTOPHER JOHN BOYCE contrary to the provisions of' the statute of the United States." (R.T. 13: 217).

Count Seven charged Lee with having "unauthorized possession" of the various

documents relating to the national defense, "willfully communicates, delivers, or transmits, or attempts to communicate, deliver, or transmit the same to any person (explained in the instructions as agents of the U.S.S.R., see R.T. 13: 223) not entitled to receive it." (R.T. 13: 222).

Count Ten charged Lee with "knowingly and wilfully act[ing] as an agent of . . . the Government of the Union of Soviet Socialist Republics, without prior notification to the Secretary of State [of the United States]." (R.T. 13: 225)

Count Twelve charged Lee with "knowingly and wilfully receiv[ing], conceal[ing], and retain[ing] with intent to convert to his own use and gain, records and things of value of the United States . . . knowing same to have been embezzled, stolen, purloined, and converted, said documents exceeding in value the sum of $100.00." (R.T. 13: 228)

The judge charged the jury that the crimes Daulton Lee was charged with "require proof of specific intent" which required the government to prove "that the defendant knowingly did an act which the law forbids, purposely intending to violate the law." (R.T. 13: 184) Had the jury believed that Lee was acting for the C.I.A. or had a reasonable belief that he was acting for the C.I.A., then they could not have found that he had the specific intent as the judge had instructed them.

Counts One, Two, Three, Four, Seven, Ten, and Twelve all required that it be found that Lee had committed the acts described in those counts knowingly, wilfully, or both knowingly and wilfully before a guilty verdict could be returned. The judge carefully defined these terms for the jury at R.T. 13: 193:

"An act is done knowingly, as stated previously, if done voluntarily and intentionally and not because of a mistake or other innocent reason.

"The purpose of adding the word 'knowingly' was to insure that no one would be convicted for an act done because of mistake or accident or other innocent reason.

\* \* \* \* \* \*

"An act is done willfully if done voluntarily and intentionally and with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or to disregard the law."

If the jury had chosen to believe that Lee had committed the acts in question as part of his employment for the C.I.A., then they could not find that he had committed them either knowingly or willfully. Even if Lee had a mistaken belief, the jury would have exonerated him since the "knowingly" requirement was designed "to insure that no one would be convicted for an act done because of mistake or accident or other innocent reason." (R.T. 13: 193) Similarly, the jury could not have found that Lee had acted "wilfully" since that required the jury to have found that Lee acted "with bad purpose either to disobey or to disregard the law." (R.T. 13: 193)

Counts One, Two, Three, and Four all contained requirements that Lee must have acted with an intent that such actions would be to the advantage of the U.S.S.R. If the jury had chosen to believe the defense theory, then Lee could not have been convicted on those counts. The other counts and the instructions on them all included a requirement that the acts have been done for the U.S.S.R.

As the instructions show, Lee was not deprived of the opportunity to present a defense based on C.I.A. employment or a reasonable belief in such employment. This is not a case where the failure to give an instruction deprived the defendant of the opportunity to argue his theory of the case to the jury. The instructions which were given opened up the area for defense counsel's eloquent and vigorous argument that Lee was or could have reasonably believed he was working for the C.I.A. *See e. g.*, R.T. 13: 94, 13: 102, 13: 106, 13: 107, 13: 120, 13: 130, 13: 138, 13: 139.

### (2) *The C.I.A. Affidavits*

■ To refute any claim by Lee that he was employed by the C.I.A., the govern-

ment introduced certified affidavits from three C.I.A. officials, Robert W. Gambino, Director of the Office of Security, Robert A. Barteaux, Chief of the Information Processing Group, Information Services Staff, Directorate for Operations, and F.W.M. Janney, Director of Personnel, to show that a search of the respective records in their departments had failed to disclose any entry containing Lee's name or either of his two aliases prior to the date of his arrest on January 6, 1977. In other words, these affidavits were introduced by the government so that the jury could draw the inference that Lee had never been in the employment of the C.I.A. Lee contends that the admission of these affidavits into evidence was error because his Sixth Amendment confrontation right was violated and because the affidavits were inadmissible hearsay.

Although the right of confrontation and the hearsay rule protect similar interests of a defendant, they do not have identical applications. Evidence may be admissible under an exception to the hearsay rule and still violate the Confrontation Clause. Or, it may not violate the Confrontation Clause, but still be inadmissible hearsay. *California v. Green,* 399 U.S. 149, 155–156, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).

The affidavits in question were admitted under a well-established exception to the hearsay rule. The absence of any record, or a negative record, is generally admissible into evidence over a hearsay objection. Rule 27 of the Federal Rules of Criminal Procedure provides that "[a]n official record or an entry therein or the lack of such a record or entry may be proved in the same manner as in civil actions." Rule 44 of the Federal Rules of Civil Procedure provides that:

"(b) written statement that after a diligent search no record or entry of a specified tenor is found to exist in the records [of his office,] designated by the statement, . . . is admissible as evidence that the records contain no such record or entry."

And finally, the Federal Rules of Evidence specifically allow the admission of these negative records:

"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

\*    \*    \*    \*    \*    \*

"(10) *Absence of public record or entry.* To prove the absence of a record, report, statement, or data compilation, in any form, or the nonoccurrence or nonexistence of a matter of which a record, report, statement, or data compilation, in any form, was regularly made and preserved by a public office or agency, evidence in the form of a certification in accordance with rule 902, or testimony, that diligent search failed to disclose the record, report, statement, or data compilation, or entry."

Fed.R.Evid. 803(10). The Advisory Committee to the Federal Rules of Evidence said that the absence of any record is "probably not hearsay as defined in Rule 801." The exceptions to the hearsay rule which provide for the admissibility of negative records in the Federal Rules [Fed.R.Evid. 803(7) & 803(10)] were designed to resolve any doubts about such evidence in favor of admissibility. When confronted with hearsay objections to evidence of the absence of any record, most courts have held such evidence admissible.[6] Therefore, we find that the district court did not err in admitting the C.I.A. affidavits over Lee's hearsay objection.[7]

---

**6.** *See United States v. Harris,* 551 F.2d 621 (5th Cir. 1977), *cert. denied,* 434 U.S. 836, 98 S.Ct. 125, 54 L.Ed.2d 98. *United States v. Zeidman,* 540 F.2d 314 (7th Cir. 1976); *United States v. Rogers,* 454 F.2d 601 (7th Cir. 1971); *United States v. De Georgia,* 420 F.2d 889 (9th Cir. 1969); *United States v. Thompson,* 420 F.2d 536 (3rd Cir. 1970); *McClanahan v. United States,* 292 F.2d 630 (5th Cir. 1961), *cert. de-*

nied, 368 U.S. 913, 82 S.Ct. 193, 7 L.Ed.2d 130; *Keith v. United States,* 250 F.2d 355· (5th Cir. 1957); *Nichols v. United States,* 48 F.2d 46 (5th Cir. 1931).

**7.** We note that there may have been a problem with the foundation requirement of Fed.R.Evid. 803(10), since the affidavits did not certify "that *diligent* search failed to disclose the rec-

*Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) is the leading Supreme Court case on the Sixth Amendment confrontation right when evidence has been admitted pursuant to a well-recognized exception to the hearsay rule. The court gave four reasons in support of its conclusion that the hearsay evidence had not violated the defendant's right of confrontation:

(1) The statement contained no express assertion about past facts.

(2) The declarant was in a position to have personal knowledge of the matters in the statement.

(3) The possibility that the declarant's statement was founded on faulty recollection is extremely remote.

(4) The circumstances surrounding the making of the statement were such that the possibility of misrepresentation was unlikely.

400 U.S. at 88–89, 91 S.Ct. at 210. After applying these factors to the present case, we conclude that the admission of the C.I.A. affidavits did not deprive Lee of his Sixth Amendment right of confrontation.

The first factor is the only one which may support Lee's position.[8] Assuming, as we do, that the affidavits contained statements about past facts, the other factors strongly support our holding. All three of the C.I.A. officials were in a position to know what their files contained. Lee did not challenge the foundation for the receipt of the affidavits. Robert W. Gambino personally examined the files of the Office of Security and found no previous record of Lee. Robert A. Barteaux and F. W. M. Janney, as custodians of the records in their respective departments, supervised searches of the records by personnel in their departments. These C.I.A. officials were in positions to have personal knowledge of whether there was any record of Lee. It is doubtful that the statements were based on faulty recollection. As indicated by the affidavits, all three of the officials were in positions of superior responsibility. The rationale which underlies all of the public document exceptions to the hearsay rules is that statements made by public officials in the discharge of their duties are generally trustworthy. The fact that the C.I.A. is the public agency involved is not a sufficient reason in itself to doubt the veracity of its officials. And finally, the circumstances surrounding the making of the affidavits also give credence to them. They were prepared on May 9, 1977, during the trial in this case. The C.I.A. officials knew that they were to be used in this action.[9] Presumably, these officials are aware of the consequences of swearing to the absence of any record in a court proceeding if in fact a record had existed.

Guided by these indicia of reliability, we are convinced that the admission of the C.I.A. affidavits did not violate Lee's Sixth Amendment confrontation right.[10] We find

ord." *United States v. Rich,* 580 F.2d 929 (9th Cir. 1978). However, failure to include the word "diligent" is not sufficient to justify exclusion of the affidavits. *United States v. Farris,* 517 F.2d 226 (7th Cir. 1975), *cert. denied,* 423 U.S. 892, 96 S.Ct. 189, 46 L.Ed.2d 123; *United States v. Dota,* 482 F.2d 1005 (10th Cir. 1973), *cert. denied,* 414 U.S. 1071, 94 S.Ct. 583, 38 L.Ed.2d 477. Moreover, there was no specific objection to this, and most importantly, there was sufficient indicia of trustworthiness to support their admission. (See following discussion of factors which indicate trustworthiness of the affidavits against Lee's Sixth Amendment challenge.)

8. The Gambino affidavit was signed three days after the search was made. The Barteaux affidavit was signed on May 9, 1977, and the two searches were made on January 7, 1977, and

April 19, 1977, respectively. The Janney affidavit was also signed on May 9, but it does not give a date as to when the search was made.

9. The affidavits are sufficiently obvious to support this inference. They were signed during Lee's trial. Each one has the following heading: United States District Court, Central District of California, United States of America, Plaintiff, v. Christopher John Boyce, Andrew Daulton Lee, Defendants.

10. The failure of Lee's counsel to subpoena the authors of the affidavits is also a factor that may be taken into account in determining whether Lee was denied his Sixth Amendment confrontation rights. *See Dutton v. Evans,* 400 U.S. 74, 88 n. 19, 96 n. 3, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); *Hollbrook v. United States,* 441 F.2d 371, 373 (6th Cir. 1971); and *cf. Unit-*

additional support for our holding in that the majority of the courts, by far, which have considered the admission of negative records against the Sixth Amendment challenge have arrived at the same conclusion.[11]

### (3) Discovery Motions

As indicated above, the indictment alleged violations of 18 U.S.C. § 793 and § 794. To establish a violation of these sections, it must be proved that the information gathered or transmitted related to the "national defense." Lee contended that the Pyramider project did not relate to the "national defense."

Prior to trial the government possessed some thirty-five documents relating to the Pyramider project and planned to use eight of these at trial. Lee moved pursuant to Rule 16, Fed.Rules Crim.Proc., for production of all of these documents. However, the court only ordered production of the eight documents which the government intended to introduce at trial. The court denied Lee's other discovery motions.

■ Lee now contends that the trial court's denial of his motion to discover the other Pyramider documents was prejudicial error. We disagree for several reasons. First, Lee completely fails to show how the eight documents which he was given were inadequate to substantiate his claim that the Pyramider project did not relate to "national defense." Secondly, while the government did not turn over the other twenty-seven documents to the defense, the government did stipulate that a representative of Lee's, a Mr. Wasson, would be permitted to view the documents in the offices of the United States Attorney (C.R. 458). An order was entered by the trial court to effectuate this stipulation (C.R. 459). Lee fails to make any showing of prejudice from having his representative view the documents as opposed to his possession of the documents themselves. As the government aptly points out, "[s]ignificantly, Lee never called Mr. Wasson to testify to state his view on whether the documents related to national defense." (Appellee's Brief, p. 40). Third, Lee had the opportunity to fully cross-examine Leslie Dirks, the C.I.A. Deputy Director for Science and Technology, who authorized the Pyramider project and who testified that the project related to the "national defense." Finally, "[t]he scope of discovery under Rule 16 is within the discretion of the trial judge and is not reviewable absent abuse." *United States v. Evans*, 542 F.2d 805, 809 (10th Cir. 1976), *cert. denied*, 429 U.S. 1101, 97 S.Ct. 1124, 51 L.Ed.2d 550 (1977). *See also United States v. Fulton*, 549 F.2d 1325, 1328 (9th Cir. 1977). We find that the trial court did not abuse its discretion in denying Lee's discovery motion.

■ Lee also contends that the trial court erred in denying his motion for discovery of documents relating to codefendant Boyce's security clearance. This is wholly without merit. The government turned over these documents and the matter was resolved at trial as this colloquy between counsel establishes:

"Mr. Levine [Gov. Counsel]: Your honor, in regard to that, we are providing them with documents relating to that, to Mr. Boyce's security clearance. We indicated that in response to Mr. Dougherty's motion in regard to Mr. Boyce and copies will also be provided to defendant Lee.

---

ed States v. Barnett, 448 F.2d 36 (9th Cir. 1971). It is not necessarily a decisive factor. *Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968).

11. *See United States v. Downing*, 454 F.2d 373 (10th Cir. 1972); *Warren v. United States*, 447 F.2d 259 (9th Cir. 1971); *United States v. Mix*, 446 F.2d 615 (5th Cir. 1971); *United States v. Thompson*, 420 F.2d 536 (3rd Cir. 1970).

*T'Kach v. United States*, 242 F.2d 937 (5th Cir. 1957) is particularly analogous to the present case. The defendant had been convicted of falsely representing himself to be a personal envoy of the President. The government introduced an affidavit from a White House personnel officer stating that the records had been searched and there was no record that the defendant had ever been employed by the President. The court found that the affidavit was admissible and that its admission had not violated the defendant's constitutional right of confrontation.

"The Court: All right. Does this dispose of all of defendant Lee's discovery motions?

"Mr. Re [Lee's Counsel]: Yes, your honor." (R.T. 101g).

#### (4) *Limitation on Expert Testimony*

■ The Pyramider project documents were classified "Top Secret" under the criteria of a certain Executive Order 11652. Lee wanted to challenge the propriety of the classification and called to the stand one William Florence, an alleged expert on the classification of documents under this executive order. He inquired of Florence the "meaning and application" of Executive Order 11652. The purpose of the inquiry, according to Lee, was "to afford the jury a standard by which they could determine if the Pyramider documents were properly classified as Top Secret." (Lee's Opening Brief, p. 47) We find that such an inquiry was totally irrelevant to the issues of this case and of no help to the jury.

Under the espionage statutes charged in the indictment (see notes 3 & 4, *supra* ), Lee was found guilty of gathering and transmitting documents which relate to the "national defense." There is no requirement in these statutes that the documents be properly marked "Top Secret" or for that matter that they be marked secret at all. It is enough that they related to the national defense and that they are transmitted with the intent to advantage a foreign nation or injure the United States. There is no question from the evidence produced at trial that the Pyramider documents related to "national defense." *See Gorin v. United States,* 312 U.S. 19, 61 S.Ct. 429, 85 L.Ed. 488 (1941).

Since the "expert testimony" of Florence on this subject of improper v. proper classification would not give "appreciable help" to the jury in deciding the guilt or innocence of Lee, it was properly excluded by

the trial court. Such a decision "is committed to the 'broad discretion' of the trial judge and his action will not be disturbed unless manifestly erroneous." *United States v. Amaral,* 488 F.2d 1148, 1152 (9th Cir. 1973). We are unable on this record to find that the trial court's action in limiting Florence's testimony was erroneous, much less "manifestly erroneous."

#### (5) *Evidentiary Hearing on Attorney's Conflict of Interest*

■ The issue of a potential conflict of interest involving codefendant Boyce's attorneys was first raised by the government at the conclusion of pretrial proceedings. The government informed the court that a member of the law firm representing Boyce had at one time worked for the C.I.A. and that the attorney (Chelius) who actively represented Boyce did perform some work for the C.I.A. and did occasionally come into contact with contracts involving the C.I.A. The law firm resigned from the case and with Boyce's approval Chelius resigned from that law firm to remain as counsel for Boyce. Lee's counsel requested an evidentiary hearing based on the speculative possibility that Boyce's attorneys might have reported defense strategy to the government. The trial court briefly inquired of Attorney Chelius whether there were any events which had taken place on his part or on the part of his colleagues which had prejudiced or would prejudice the interests of his client or the interests of defendant Lee. (R.T. 1166–67). Chelius answered in the negative. (R.T. 1167).

After this inquiry, the trial court denied Lee's motion for an evidentiary hearing. Lee contends this was reversible error. We cannot agree. First, the trial court performed enough of an inquiry (though informal) to satisfy itself that Boyce's counsel had not sold out the defense to the prosecution (see trial court's comments, R.T. 1167–1168).[12] Secondly, evidentiary hearings

---

12. In these comments the trial court stated: "Mr. Chelius, you are an esteemed member of the bar of this Court. . . . You have earned your reputation and you are entitled to it. And, because you are, the Court has

summarily—and if it knew a more summarily way to do so—rejected all of the implications present in the motion just made and denied with respect to Defendant Lee. You took an oath before the bar of this Court, and this is

need be held only "when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that relief must be granted if the facts alleged are proved." *United States v. Carrion,* 463 F.2d 704, 706 (9th Cir. 1972). Lee's motion did not satisfy these standards.

Therefore, for these reasons, we find that the denial of Lee's motion for an evidentiary hearing was not reversible error.

AFFIRMED.

as much known to you as it is to the Court and ought to be to others. If our system *cannot function with respect to the kind of matters which have come under discussion here on the basis of professional integrity,* and on the basis of lawyer devotion to the interests of his client, and on the basis of faithfulness to oaths, then, we have no viable system. . . . most are of the view that it is a wholly viable system and, most particularly, in respect to such matters."