UNITED STATES of America,
Plaintiff-Appellee,

v.

Roy Moreno RAMIREZ,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Robert H. REYNOLDS,
Defendant-Appellant.

Nos. 81–1728, 81–1729.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 4, 1982.

Decided July 12, 1983.

Kendra S. McNally, Asst. U.S. Atty., Los Angeles, Cal., for United States.

Kenneth Rodman, Encino, Cal., for Ramirez.

Michael Levine, Federal Public Defender, Honolulu, Hawaii, for Reynolds.

Before ELY, SNEED and ALARCON, Circuit Judges.

SNEED, Circuit Judge:

Appellants Ramirez and Reynolds, along with codefendants Peterson, Miller, and Baerenwald, were indicted for conspiracy to transport stolen aircraft, import marijuana, and distribute marijuana, in violation of 18

U.S.C. § 371 (Count I); foreign transportation of stolen aircraft, in violation of 18 U.S.C. § 2312 (Counts II & III); importation of marijuana, in violation of 21 U.S.C. § 960(a)(1) (Counts IV & VI); and possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1) (Counts V & VII).[1] Appellants were tried before a jury in a joint trial.[2] Ramirez was convicted on all counts and was sentenced to a twelve year prison term. Reynolds was convicted on Count II and was sentenced to a four year prison term; he was acquitted on Count III and a mistrial was declared on all remaining counts when the jury was unable to reach verdicts on those counts. We affirm.

## I.

## FACTS

. This case arises out of the theft of two airplanes, a Cessna 404 Titan Courier and an Aero Commander 500 Shrike, from the Long Beach, California airport, and the use of these planes to import approximately 1,000 pounds of marijuana into the United States from Mexico. Evidence introduced at trial described a series of meetings and transactions that transpired between five primary participants during the period from February to May of 1981. Two of the five persons indicted, William Miller and Gary Baerenwald, entered into plea agreements and testified for the government. Miller testified that he stole the two aircraft and piloted the planes to and from Mexico. Baerenwald testified that he introduced appellants Reynolds and Ramirez, and that he participated in the effort to find planes that could be stolen as well as in the search for suitable "clandestine" airfields in the United States. Robert Peterson, charged with off-loading and delivering shipments of marijuana once they reached the United States, was tried with appellants but was acquitted.

Ramirez, however, was convicted as the instigator and financier of the criminal scheme. The government's evidence against Ramirez was designed to show only that Ramirez directed the criminal scheme from behind the scenes. He played a minor role in actually implementing the scheme through the theft of airplanes and the delivery of marijuana. His defense rested on the alleged weakness of the government's evidence of his connection to the conspiracy.

Reynolds' part was considerably more complex. Before February of 1981, the approximate time when the charged conspiracy was formed, Reynolds had been working as an informer for the Los Angeles Police Department (LAPD). The relationship was not a happy one. Reynolds admits compromising one narcotics investigation by warning the suspect, a friend of Reynolds. Other attempts by the LAPD to set up drug arrests through Reynolds were likewise unsuccessful. Sergeant Fred McNight of the LAPD testified at the trial below that by January 1981, the LAPD had decided that Reynolds was not trustworthy and that he would be regarded as a double agent.

One month later, the activities charged in the present indictment commenced. Unlike Ramirez, Reynolds freely admitted at trial that he participated fully in the overt acts taken to implement the goals of the conspiracy. Also between February and June of 1981 Reynolds informed the LAPD of impending meetings so that the police could observe. It is this latter activity that makes this case somewhat unique. Reynolds' principle defense at trial was that at all times during the admitted criminal scheme he was acting as a police informer and that as such he did not have the specific criminal intent necessary for conviction.

On appeal, Reynolds and Ramirez both allege instances of reversible error on the

---

1. Both appellants as well as defendant Miller were charged in all seven counts of the indictment. Defendant Peterson was charged in Counts I, V, and VII and defendant Baerenwald was charged in Counts I and II.

2. Baerenwald and Miller entered into plea agreements and testified at appellants' trial on behalf of the government. Peterson was tried with appellants and acquitted on all counts.

part of the district court, and that the evidence was insufficient to sustain their convictions. We shall consider Reynolds' appeal first.

## II.

### APPELLANT REYNOLDS

Reynolds advances six grounds for reversing his conviction for foreign transportation of stolen aircraft (Count II). He contends that the district court erred by: (1) denying a motion to dismiss the indictment for outrageous police misconduct; (2) improperly admitting appellant's confession into evidence; (3) failing to give jury instructions requested by appellant; (4) denying appellant's motion for mistrial on grounds of improper jury coercion; (5) refusing to strike "prejudicial surplusage" from the indictment; and (6) failing to direct that he be acquitted on the ground of insufficient evidence to sustain the verdict. We hold that none of the claims of error justifies reversal.

A. *Denial Of Motion To Dismiss Indictment For "Outrageous Police Misconduct"*

Appellant filed a pretrial motion to dismiss the indictment because of "outrageous police conduct" which the district court took under submission. At the close of testimony appellant renewed the motion and it was denied. Appellant advances two theories to justify dismissal of his indictment. One is that the conduct of the police violated the Due Process Clause. The second, and alternative theory, is that the police conduct justifies an invocation of the inherent supervisory power of the district court to dismiss indictments or take other remedial action. Under both theories the alleged misconduct is that police coerced Reynolds into acting as an informer, played an active role in the resulting criminal enterprise, and then prosecuted Reynolds for doing only

what the police had instructed him to do. We reject both of appellant's theories because the police conduct in this case was within permissible limits.

1. *Due Process.*

The existence of police misconduct that contravenes the constitutional due process is a question of law. *United States v. Wylie,* 625 F.2d 1371, 1378 (9th Cir.1980), *cert. denied,* 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 84 (1981); *United States v. McQuin,* 612 F.2d 1193, 1196 (9th Cir.), *cert. denied,* 445 U.S. 955, 100 S.Ct. 1608, 63 L.Ed.2d 791 (1980). As a defense it is a close relative of entrapment and has been applied where the involvement of undercover agents and informers in contraband offenses reaches "such proportions as to bar conviction of a predisposed defendant as a matter of due process." *Hampton v. United States,* 425 U.S. 484, 493, 96 S.Ct. 1646, 1651, 48 L.Ed.2d 113 (1976) (Powell, J., concurring); *see United States v. McQuin,* 612 F.2d at 1196. An example is where government agents engineer and direct the criminal enterprise from start to finish.

The due process defense, while potentially broad, has in fact been severely restricted. *See United States v. Bagnariol,* 665 F.2d 877, 881–83 (9th Cir.1981), *cert. denied,* 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982) (tracing development of the defense both in this circuit and in the Supreme Court). Prosecution is barred "only when the government's conduct is so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Ryan,* 548 F.2d 782, 789 (9th Cir.1976), *cert. denied,* 430 U.S. 965, 97 S.Ct. 1644, 52 L.Ed.2d 356 (1977). The Supreme Court has never reversed a criminal conviction on this ground. *See United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976).[3] Only twice have

---

**3.** Indeed, Justice Rehnquist, writing the plurality opinion in *Hampton,* suggests that the Due Process Clause would never prevent the conviction of a predisposed defendant. Because

five Justices expressed explicit disagreement with this portion of Justice Rehnquist's opinion, however, we have held that *Hampton* "left open the possibility that the conviction of a

federal circuit courts done so.[4] In both cases the outrageous misconduct was, in effect, the generation by police of new crimes merely for the sake of pressing criminal charges against the defendant.

■ That did not happen in this case. The government did not create the crime— Reynolds and his associates did that. Reynolds informed the agents of the criminal enterprise, but that did not enmesh the government in the criminal activity in an unconstitutional manner. Nonetheless, appellant contends that pervasive misuse of police authority here implicates due process concerns and points to dictum in our cases which suggests that indictments might be dismissed where police conduct constitutes "action *malum in se.*" *See United States v. Gonzales,* 539 F.2d 1238, 1239–40 (9th Cir. 1976). While we do not preclude the possibility that police involvement in crime that falls short of sharing in the creative act might violate the due process clause; the police conduct here meets constitutional standards.

We acknowledge that the relationship between the police and Reynolds was not shiny-bright. Reynolds asserts that the police illegally bribed and coerced him into working as an informer, with specific instructions to enter into a criminal conspiracy in order to set up a narcotics bust. There is some support for this allegation in the record. In June of 1980, Sergeant McNight of the LAPD arrested Reynolds, who was then on federal parole, in an unrelated case. Reynolds testified at trial that McNight threatened to report parole violations to Reynolds' parole officer unless Reynolds agreed to work as a police informant. McNight corroborated this allegation, at least in part, by testifying that he used the fact of Reynolds' federal parole status as an inducement to get Reynolds to cooperate in future police investigations. Reynolds testified that McNight further encouraged his cooperation by promising to allow him to sell marijuana as part of his undercover activities and to keep the profit. While McNight's testimony to some degree refutes this allegation, there is evidence in the record that suggests that officers were aware on at least one occasion that Reynolds was selling illegal drugs to William Miller, one of the alleged coconspirators in this case.

Reynolds further contends that though he used his best efforts to set up a narcotics arrest, the police repeatedly lied to him and made phony inducements while all the time intending to arrest him once appellant's usefulness had ended. Again, Reynolds' contention is not entirely without substantiation. Sergeant McNight testified that the LAPD lost its trust in Reynolds due to several instances where Reynolds compromised ongoing police investigations. Following this the police determined to continue using Reynolds to gain any information possible from him while at the same time to mislead or misdirect him as much as possible. The aura these facts emanate is one familiar to readers of spy novels.

Appellant argues, in effect, that this aura demonstrates that his prosecution is fundamentally unfair, justifying dismissal of the indictment. The government, in rebuttal, cites numerous instances where Reynolds,

predisposed defendant may be reversed where the government's involvement in the criminal scheme reaches such an outrageous level as to violate due process." *United States v. Gonzales-Benitez,* 537 F.2d 1051, 1055 (9th Cir.), *cert. denied,* 429 U.S. 923, 97 S.Ct. 323, 50 L.Ed.2d 291 (1976); *accord United States v. McQuin,* 612 F.2d at 1196.

4. In *United States v. Twigg,* 588 F.2d 373 (3d Cir.1978), the indictment was dismissed where the government, through an informer, provided the location and all necessary chemicals and equipment for a "speed" laboratory. The informant was in complete charge of the laboratory;

defendant's assistance was minimal and at the specific direction of the informant. Similarly, in *Greene v. United States,* 454 F.2d 783 (9th Cir.1971), this court reversed conspiracy and bootlegging convictions where government undercover agents helped to reestablish, and then sustain, criminal bootlegging operations that had been shut down by prior criminal convictions. "We do not believe the Government may involve itself so directly and continuously over such a long period of time in the creation and maintenance of criminal operations, and yet prosecute its collaborators." *Id.* at 787.

while purporting to work as an informer, instead double-crossed the LAPD, compromised ongoing narcotics investigations, and lied to law enforcement officers. The crux of the government's case is that Reynolds was a "double agent" using the cloak of police authority to cover his intention to complete the plane theft and marijuana importation scheme and to leave the LAPD "out in the cold." The government argues that under these circumstances the police acted within permissible limits when, in order to break up the smuggling operation, they continued to utilize Reynolds and did nothing to remove him from the conspiracy.

■ We have carefully reviewed the record in this case and hold that it substantiates the district court's conclusion that police investigatory practices employed here did not violate Reynolds' due process rights. We have repeatedly held that government agents may use informants and pay them, *United States v. Wylie,* 625 F.2d at 1378, and that, when working undercover, they may in proper circumstances supply contraband to a suspect to gain his confidence, *United States v. Gonzales-Benitez,* 537 F.2d 1051 (9th Cir.), *cert. denied,* 429 U.S. 923, 97 S.Ct. 323, 50 L.Ed.2d 291 (1976). Also the government may use artifice and stratagem to ferret out criminal activity. *See Sorrells v. United States,* 287 U.S. 435, 441, 53 S.Ct. 210, 212, 77 L.Ed. 413 (1932). Only extreme misconduct constitutes a due process violation. *United States v. Gonzales,* 539 F.2d at 1240. Here, we do not find the police conduct "so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Ryan,* 548 F.2d at 789.

### 2. *Supervisory power.*

Reynolds' appeal to the supervisory power of the federal courts as an alternative ground for dismissal of his indictment is likewise unavailing. The district court declined to exercise its power. The issue is whether the district court abused its discretion. *United States v. Gonsalves,* 691 F.2d 1310, 1322 (9th Cir.1982), *petition for cert. filed,* 51 U.S.L.W. 3884 (U.S. June 14, 1983) (No. 82–1944); *United States v. Brown,* 602

F.2d 1073, 1076–77 (2d Cir.), *cert. denied,* 444 U.S. 952, 100 S.Ct. 427, 62 L.Ed.2d 323 (1979). We think not.

■ Supervisory power is commonly viewed as an inherent power to preserve the integrity of the judicial process. *United States v. Gonsalves,* 691 F.2d at 1316 (tracing the development of the supervisory power since it first appeared as an independent basis of decision in *McNabb v. United States,* 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943)). In *United States v. Owen,* 580 F.2d 365 (9th Cir.1978), we held explicitly that a federal court is empowered, pursuant to its inherent supervisory power, to dismiss an indictment in appropriate cases on the basis of governmental misconduct. The power, however, has been infrequently utilized, *id.* at 367; *see Hampton v. United States,* 425 U.S. at 493–95, 96 S.Ct. at 1651–52 (Powell, J., concurring), and a dismissal should be granted only when there is a clear basis in fact and law for doing so, *see United States v. Chanen,* 549 F.2d 1306, 1313 (9th Cir.), *cert. denied,* 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 83 (1977).

■ In determining whether there was a sound basis for invoking the supervisory power we are guided by *United States v. Hasting,* —— U.S. ——, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983), where the Supreme Court listed three purposes which may properly underlie use of the power: (1) to implement a remedy for violation of recognized rights; (2) to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury; and (3) as a remedy designed to deter illegal conduct. *Id.* at ——, 103 S.Ct. at 1978 (citations omitted). Here, we have held that actions on the part of law enforcement officers did not exceed the bounds of permissible investigatory conduct. We need inquire no further. None of the purposes recognized by the Supreme Court would be furthered by the exercise of the supervisory power in the present case. It follows that the district court did not abuse its discretion by declining to invoke its inherent power to dismiss appellant's indictment.

## B. *Admission Of Appellant's Confession Was Not Reversible Error*

Appellant next contends that the government did not lay an adequate foundation regarding appellant's receipt and waiver of his *Miranda* rights and that certain incriminating statements should have been excluded from evidence. Significantly, appellant did not move to suppress the inculpatory statements either before or during trial. *See* Fed.R.Crim.P. 12(b)(5). Nor does he seriously argue on appeal that his *Miranda* rights were in fact violated or that the incriminating statements were involuntarily given. Rather, appellant contends merely that admission of his confession was reversible error because the government failed to first make an affirmative showing that he waived his *Miranda* rights and that the incriminating statements were voluntarily given.

Our recent decision in *United States v. Smith*, 638 F.2d 131 (9th Cir.1981), is controlling. There the defense conceded prior to trial that the defendant's statements were admissible with the caveat that an attack would be made on their weight or credibility. *Id.* at 133. Despite this concession defense counsel nonetheless sought to bar admission of defendant's statements on the ground that the prosecutor had failed to lay an adequate foundation to show that the confession was voluntary. We found that despite appellant's objection for inadequate foundation, no issue of inadmissibility as a matter of law had been raised at trial. *Id.* In such cases, "the only preliminary foundation that need be laid by the prosecutor is that proper *Miranda* warnings were given *and the elucidated rights were waived.*" *Id.* (Italics supplied).

Here, the government elicited evidence of Reynolds' incriminating statements from FBI Special Agent Hawkins. Hawkins testified that appellant was advised of his *Miranda* rights through the use of a *Miranda* card. Counsel for appellant objected to further testimony on the ground of "lack of foundation as to the *Miranda* rights." The district court overruled the objection, holding that *Miranda* rights had been adequately established, and agent Hawkins' testimony was admitted.

Appellant is correct when he asserts that the record, at the point of Hawkins' testimony, shows that appellant had been read his *Miranda* rights but not that he had waived them. At that point there is no evidence that speaks to the waiver issue. While waiver of *Miranda* rights need not be explicit, *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979), " '[p]resuming waiver from a silent record is impermissible,' " *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966) (*quoting Carnley v. Cochran*, 369 U.S. 506, 516, 82 S.Ct. 884, 890, 8 L.Ed.2d 70 (1962)). A waiver cannot be presumed simply from the fact that *Miranda* warnings were given and a confession was eventually obtained. *Miranda*, 384 U.S. at 475, 86 S.Ct. at 1628; *see North Carolina v. Butler*, 441 U.S. at 373, 99 S.Ct. at 1757. Thus, the district court erred when it admitted testimony of inculpatory statements prior to establishing a waiver.

The error, however, was harmless beyond a reasonable doubt. Evidence introduced both by the government and by the defense subsequent to Agent Hawkins' testimony supplements the otherwise inadequate foundation and shows conclusively that appellant did indeed waive his rights under *Miranda*. Appellant testified that he remembered being advised of his *Miranda* rights and further that he had responded affirmatively when asked if he wanted to say anything: "I indicated I did. I wanted to clarify this." Additionally, Sergeant Perry of the San Bernadino Sheriff's Office, who was present at appellant's interview, testified during the government's rebuttal case that he had personally read appellant each of his *Miranda* rights and that appellant stated that he both understood the rights, and was willing to talk about the charges against him. This evidence is adequate to show that appellant's statements were the product of a knowing and intelligent waiver of *Miranda* rights. This cured the defect. *See Kear v. United States*, 369 F.2d 78, 83 (9th Cir.1966). The premature

entry into evidence of appellant's statements could in no way have affected the jury's verdict. Consequently, the error was harmless beyond a reasonable doubt. *United States v. Hasting,* —— U.S. ——, ——, 103 S.Ct. 1974, 1979, 76 L.Ed.2d 96 (1983).

## C. *Refusal To Give Requested Jury Instructions Was Not Error*

Appellant claims that the district court erred in failing to give two jury instructions proposed by the defense, each of which spelled out appellant's claimed defense that he was working as a police undercover agent at all times during his participation in the crimes charged.[5] Both instructions were refused, and appellant contends that such refusal was reversible error. We disagree.

The governing law was stated in *United States v. Kaplan,* 554 F.2d 958 (9th Cir.), *cert. denied,* 434 U.S. 956, 98 S.Ct. 483, 54 L.Ed.2d 315 (1977):

> While it is clear that the trial judge must instruct the jury as to the defendant's theory of the case, the instructions given need not be in the precise language requested by the defendant. The refusal to give a requested instruction is not error "if the charge as a whole adequately covers the theory of the defense."

*Id.* at 968 (citations omitted). Here, appellant contends that the jury was not adequately instructed on the legal significance of his theory of defense. Two prior decisions of this court refute this contention.

First, in *United States v. Lee,* 589 F.2d 980 (9th Cir.), *cert. denied,* 444 U.S. 969, 100 S.Ct. 460, 62 L.Ed.2d 382 (1979), the defendant was charged with selling information relating to the national defense. Lee's theory of defense was that he either was working or believed that he was working for the CIA. The defense requested an instruction requiring the jury to acquit unless convinced beyond a reasonable doubt that Lee did not have a reasonable belief that he was working for the CIA. We held that failure to give the instruction was not error because the district court had instructed on criminal intent. The jury could not convict Lee if they believed his defense because that defense negated the necessary finding of intent. *Id.* at 986.

Similarly, in *United States v. Hughes,* 626 F.2d 619 (9th Cir.), *cert. denied,* 449 U.S. 1065, 101 S.Ct. 793, 66 L.Ed.2d 611 (1980), the theory of defense was that the sale of government property charged in the indictment had been authorized by government agents. The trial court denied a proposed instruction similar to those proposed in *Lee,* as well as those Reynolds urges here. We again held that intent instructions gave the defendant the opportunity to have his defense considered by the jury. *Id.* at 627.

 Appellant would distinguish *Lee* and *Hughes* on the basis that in neither case was there any credible evidence to support the defense theory. Appellant misunderstands the thrust of our decisions. The district court below instructed the jury that the crimes charged required specific intent to convict.[6] If the jury had believed that

---

**5.** Proposed defense instruction number one stated:

> A person who participates in a crime solely at the behest of law enforcement agencies, and solely for the purpose of providing the agencies with information about the crime or its other participants, cannot himself be found guilty of the crime.
> So if the evidence in the case raises a reasonable doubt whether during his participation in any of the crimes charged in the indictment a defendant was acting solely at the behest of law enforcement agencies, and solely for the purpose of providing them with information about the crime or its other participants, you must find the defendant not guilty of that crime.

Proposed defense instruction number three merely restated the substance of proposed defense instruction number one.

**6.** The district court instructed the jury as follows:

> The crimes charged in this case require proof of specific intent before the defendant can be convicted.
> Specific intent, as the term implies, means more than the general intent to do the act.
> To establish specific intent the Government must prove that the defendant knowingly did an act which the law forbids, or knowingly failed to do an act which the law requires, purposely intending to violate the law. Such

appellant never intended to abandon his role as a police informer, then they could not have found the necessary intent as explained in the district court's instructions. The district court's instructions placed appellant's defense squarely before the jury. Failure to give the proposed defense instructions was not error.

### D. The District Court Did Not Improperly Coerce The Jury

Appellant next asserts that the district court intruded improperly into the jury's deliberations. The dispute arose when the jury, after deliberating for approximately twelve hours, returned verdicts as to defendants Peterson and Ramirez and also presented the court with a completed "verdict form" for appellant Reynolds showing that for each count, the jury was unable to reach a verdict. After a conference at side bench the district court had the following response for the jury.

> THE COURT: Ladies and gentlemen of the jury, the verdict form returned with respect to Mr. Reynolds is unacceptable.
>
> You are accordingly ordered to return here tomorrow morning at 9:30 to continue deliberation with respect to Mr. Reynolds.
>
> We will be in contact with you sometime after that.
>
> You are ordered to return here at 9:30 tomorrow morning.

Appellant moved immediately for a mistrial arguing that the court's use of the term "unacceptable" could cause the jury to think that they had no choice but to reach a verdict. That motion was denied.

Appellant here relies principally on *Jenkins v. United States,* 380 U.S. 445, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965) (per curiam). There the jury deliberated for only two hours before notifying the court that they were unable to reach a verdict. In the course of his response the trial judge stated: "You have got to reach a decision in this case." *Id.* at 446, 85 S.Ct. at 1060. The Supreme Court remanded for a new trial because "in its context and under all the

circumstances the judge's statement had the coercive effect attributed to it." *Id.*

■ *Jenkins* means that the trial court may not insist upon a dispositive verdict. When reviewing allegedly coercive instructions or comments our inquiry is " 'whether in its context and under all the circumstances of this case the statement was coercive.' " *Marsh v. Cupp,* 536 F.2d 1287, 1290 (9th Cir.), *cert. denied,* 429 U.S. 981, 97 S.Ct. 494, 50 L.Ed.2d 590 (1976) (quoting *Jenkins,* 380 U.S. at 446, 85 S.Ct. at 1060); *see Locks v. Sumner,* 703 F.2d 403, 406–07 (9th Cir. 1983). Here, we do not find the same coercive influence that mandated reversal in *Jenkins.*

■ First, the district court in this case did not tell the jurors that they had to reach a dispositive verdict. *See Walsh v. United States,* 371 F.2d 135, 136 (9th Cir.), *cert. denied,* 388 U.S. 915, 87 S.Ct. 2130, 18 L.Ed.2d 1357 (1967). Nor did the jury understand the court to be insisting on a dispositive verdict. The jury deliberated for a full day after receiving the court's admonition. *Compare United States v. Beattie,* 613 F.2d 762, 765 (9th Cir.), *cert. denied,* 446 U.S. 982, 100 S.Ct. 2962, 64 L.Ed.2d 838 (1980) (no coercion where jury deliberated for three and one-half hours after *Allen* charge), with *United States v. Contreras,* 463 F.2d 773 (9th Cir.1972) (coercion found where jury deliberated only 35 minutes after *Allen* charge). Second, and more important, the jury ultimately reached dispositive verdicts on only two of the seven counts charged against appellant. These two facts show that the district court's statement did not have a *"Jenkins"* effect.

### E. Appellant's Indictment Did Not Contain Prejudicial Surplusage

■ Prior to trial appellant moved pursuant to Rule 7(d) of the Federal Rules of Criminal Procedure to have certain language stricken as "surplusage" from his indictment. The purpose of Rule 7(d) is to protect a defendant against prejudicial or

intent may be determined from all the facts
and circumstances surrounding the case.

inflammatory allegations that are neither relevant nor material to the charges. *United States v. Poore,* 594 F.2d 39, 41 (4th Cir.1979). Thus it has been invoked to strike aliases from indictments where the alias was not relevant to the issue of the defendant's identification, *see, e.g., United States v. Wilkerson,* 456 F.2d 57 (6th Cir.), *cert. denied,* 408 U.S. 926, 92 S.Ct. 2507, 33 L.Ed.2d 337 (1972), and to strike prejudicial language describing the nature of a prior felony conviction (carrying a handgun) from an indictment charging defendant with possession of a firearm by a previously convicted felon, *e.g., United States v. Poore,* 594 F.2d at 41.

■ Here, appellant seeks to extend the Rule to traditional language of the indictment, the sole purpose of which is to formally commence the government's case against a defendant. That is, he seeks to delete the signatural phrase "a true bill," the names and signatures of the Grand Jury foreperson and the United States Attorney, and the introductory phrase "the Grand Jury charges." Appellant contends that this language prejudiced him by telling the jury in effect that a higher jury, the grand jury, has found the facts in the indictment to be true and that the United States Attorney concurs in that opinion.

Appellant's contention is frivolous. The trial court properly instructed the jury both at the outset and at the completion of the trial that the indictment is not evidence against the accused and affords no inference of guilt or innocence. The refusal to strike did not constitute error.

**F. *The Evidence Was Sufficient To Sustain The Verdict***

■ In reviewing the sufficiency of the evidence on appeal we view the evidence and all inferences reasonably drawn from the evidence in the light most favorable to the government. Our inquiry is to determine whether any rational trier of fact could have found all essential elements of the crime beyond a reasonable doubt. *United States v. Buras,* 633 F.2d 1356, 1359 (9th Cir.1980).

■ Reynolds asserts that no rational jury could have found that he had the specific intent required to convict for the transportation of stolen aircraft in foreign commerce (Count II). We disagree. Reynolds admits his participation in the charged offense. His defense is based on the theory of entrapment, and on the assertion that he was at all times operating as an undercover police informer. The evidence, however, including Reynolds' own confession that he intended to leave the police out in the cold, is fully sufficient for the jury to conclude that Reynolds abandoned his informer's role and thereafter did have the requisite intent.

### III.

### APPELLANT RAMIREZ

Appellant Roy Moreno Ramirez was convicted on all seven counts included in the indictment. He advances two grounds for reversal: (1) that he was prejudiced by the joint trial in this case and thus that the district court erred by denying appellant's motion for severance; and (2) that evidence admissible against appellant is insufficient to support his conviction. Neither ground is sufficient.

**A. *Denial Of Motion For Severance Was Not Error***

■ Under Rule 14 of the Federal Rules of Criminal Procedure the district court may order a severance when it appears that a defendant may be significantly prejudiced by a joint trial with his codefendants. Generally, defendants jointly charged are to be jointly tried. *United States v. Gay,* 567 F.2d 916, 919 (9th Cir.), *cert. denied,* 435 U.S. 999, 98 S.Ct. 1655, 56 L.Ed.2d 90 (1978); *see* Fed.R.Crim.P. 8(b). Whether severance is necessary is within the sound discretion of the district court. *United States v. Gee,* 695 F.2d 1165, 1169 (9th Cir.1983).

■ The district court in the present case denied appellant's pretrial motion for severance as well as two renewals of the motion during the trial. Our task is to

determine "whether a joint trial was so manifestly prejudicial as to require the trial judge to exercise his discretion in but one way, by ordering a separate trial." *United States v. Abushi,* 682 F.2d 1289, 1296 (9th Cir.1982). Appellant bears the burden of proving such prejudice. To do this he must show more than that a separate trial would have given him a better chance for acquittal; he must show that the magnitude of the prejudice denied him a fair trial. *United States v. Gee,* 695 F.2d at 1169–70; *United States v. Escalante,* 637 F.2d 1197, 1201 (9th Cir.), *cert. denied,* 449 U.S. 856, 101 S.Ct. 154, 66 L.Ed.2d 71 (1980).

In assessing the prejudicial effect of a joint trial, our focus is on "whether the jury can reasonably be expected to compartmentalize the evidence as it relates to separate defendants in the light of its volume and limited admissibility." *United States v. Brady,* 579 F.2d 1121, 1128 (9th Cir.1978), *cert. denied,* 439 U.S. 1074, 99 S.Ct. 849, 59 L.Ed.2d 41 (1979); *accord, United States v. DeRosa,* 670 F.2d 889, 898 (9th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 353, 74 L.Ed.2d 391 (1982); *United States v. Escalante,* 637 F.2d at 1201. A variety of factors can be relevant to this determination depending upon the facts of the particular case. Here, appellant raises three such factors, each of which we now consider.

### 1. *Antagonistic defenses.*

Ramirez contends first that his defense, which relied on the insufficiency of the government's evidence against him, was irreconcilable with the defense of Reynolds, who admitted the acts charged but claimed that he was working as a government informant, and outrageous police conduct. We disagree.

Reynolds' reliance on these claims does not, by itself, justify reversal of a trial court's decision not to sever. Antagonism between defenses is not enough, even if the defendants seek to blame one another. *United States v. Brady,* 579 F.2d at 1128. Rather, it must be shown, on the facts of the individual case, that the defenses "are antagonistic to the point of being mutually exclusive." *United States v. Marable,* 574 F.2d 224, 231 (5th Cir.1978). Only where the acceptance of one party's defense will preclude the acquittal of the other party does the existence of antagonistic defenses mandate severance. *See United States v. Salomon,* 609 F.2d 1172, 1175 (5th Cir.1980); *United States v. Ziperstein,* 601 F.2d 281, 285 (7th Cir.1979), *cert. denied,* 444 U.S. 1031, 100 S.Ct. 701, 62 L.Ed.2d 667 (1980).

Here, it is clear that the jury's acceptance or nonacceptance of Reynolds' "informer" defense was largely irrelevant to the determination of Ramirez' guilt or innocence. Three witnesses—Reynolds, Miller, and Baerenwald—testified at trial that they had participated in the criminal enterprise. The question of Ramirez' guilt depended on the prosecutor's success in establishing that Ramirez had also participated. Reynolds' "informer" defense, even if accepted by the jury, neither relieved the prosecutor of this burden nor ensured his success. Significantly, defendant Peterson like Ramirez relied for his defense on the weakness of the evidence tying him to the charged conspiracy. Despite Reynolds' allegedly antagonistic defense the jury acquitted Peterson on all counts. Ramirez cannot show mutual exclusivity and, on that ground, has not established prejudice sufficient to require reversal.

Ramirez contends that Reynolds' use of the "informer" defense severely prejudiced Ramirez even if the defenses were not mutually exclusive. Reynolds testified in his own defense at trial. During cross-examination he repeatedly denied Ramirez' complicity in the crimes charged. Appellant argues that Reynolds' attempt to exonerate appellant had the opposite effect. To support this novel argument appellant asserts that Reynolds was so confusing and contradictory that it would be difficult for a jury to compartmentalize the evidence between these two defendants. He also asserts that Reynolds' testimony enabled the government to introduce otherwise inadmissible hearsay testimony of Sergeant McNight and Officer Perry regarding prior inconsistent statements in which Reynolds had

named Ramirez as the financier for the marijuana importation scheme.

Reynolds' testimony, and its impeachment by the government, perhaps reduced Ramirez' chance for acquittal. That does not demonstrate a need for severance, however. First, the same situation might have occurred at a separate trial of Ramirez; the government could have called Reynolds to testify at Ramirez' trial with similar consequences had severance been granted.[7] Moreover, even if it be assumed that Reynolds would not have testified at a separate trial, appellant still falls short of demonstrating abuse of discretion because he has failed to show that the joint trial led to violation of his substantive rights. *United States v. Escalante,* 637 F.2d at 1201.

### 2. *Disparity in the weight of evidence.*

Appellant's second theory of prejudice from joint trial relies on *United States v. DeRosa,* 670 F.2d 889 (9th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 353, 74 L.Ed.2d 391 (1982), where we stated that in reviewing a trial court's denial of a motion for severance "we must be wary of situations where a jury might impute the guilt of some defendants to other defendants." *Id.* at 898 (citation omitted). Appellant asserts that the evidence against Reynolds was so strong that it "spilled over" and caused the jury to find Ramirez guilty by association. That contention is unpersuasive.

Although appellant is correct when he states that the evidence of Reynolds' participation in the events charged was overwhelming, there is little chance that the evidence against Reynolds "spilled over." The guilt or innocence of Ramirez depends on the government's success in convincing the jury that it was Ramirez who was financing and directing the criminal enterprise from behind the scene. Proof on that issue is entirely separate from proof

that Reynolds committed the specific acts in the indictment. We find no indication that the jury was unable to compartmentalize the evidence and reach their verdict as to Ramirez on a fair evaluation of the evidence against him.

### 3. *Statements of coconspirators.*

Finally, appellant contends that a joint trial prejudiced him because certain testimony of coconspirators Miller and Baerenwald would not have been admitted at a separate trial because a proper foundation as to the existence of a conspiracy was not established in this trial and would not have been in a separate trial. This is not so. Baerenwald testified to statements made by Ramirez during a meeting between the two. As such, the testimony was admissible as a party-admission. Fed.R. Evid. 801(d)(2)(A). Miller testified to statements by Reynolds that tended to establish Ramirez' connection with the conspiracy. This testimony was also admissible against Ramirez, because it related statements by a coconspirator in furtherance of the conspiracy. Fed.R.Evid. 801(d)(2)(E). The record as a whole adequately establishes the foundation required for admission of evidence pursuant to Rule 801(d)(2)(E). *See United States v. Brock,* 667 F.2d 1311, 1315 (9th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1271, 75 L.Ed.2d 493 (1983). It follows that the testimony of Miller and Baerenwald would be admissible against Ramirez at a separate trial.

We find that the district court's failure to sever was not an abuse of discretion.

### B. *The Evidence Was Sufficient To Sustain The Verdict*

Appellant argues that the evidence was insufficient to establish his connection with the conspiracy alleged in this case. As we have said on other occasions, "[c]onspiracy is established when there is an

---

7. Appellant's reliance on *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), for the proposition that Reynolds' testimony would not have been admitted at a separate trial is misplaced. *Bruton* held only that the admission of the statements against

one defendant violates a codefendant's right of confrontation where the defendant against whom the statements were introduced failed to testify. *See United States v. Salomon,* 609 F.2d at 1176 n. 5.

agreement between two or more persons to engage in criminal activity, coupled with one or more overt acts in furtherance of the illegal purpose and the requisite intent necessary to commit the underlying substantive offense." *United States v. Abushi,* 682 F.2d at 1293. Also we have said the conspiracy may be proven by circumstantial evidence; no formal agreement need be shown; and the agreement may be inferred from the acts of the parties. *Id.* Here, the government's proof, including the testimony of coconspirators Baerenwald and Miller, was clearly adequate to show the existence of a conspiracy the goal of which was to import marijuana through the use of stolen aircraft.

▇▇▇▇ Once the existence of a conspiracy is shown, "evidence establishing beyond a reasonable doubt a connection of a defendant with the conspiracy, even though the *connection is slight,* is sufficient to convict him with knowing participation in the conspiracy." *United States v. Dunn,* 564 F.2d 348, 357 (9th Cir.1977) (emphasis in original); *see United States v. Kenny,* 645 F.2d 1323, 1335 (9th Cir.), *cert. denied,* 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425 (1981). There was substantial evidence introduced at trial documenting that Ramirez associated with conspirators Reynolds, Baerenwald, and Peterson throughout the period that events *in furtherance* of the conspiracy took place. More than mere association was established; association to further the conspiracy was also established.

The indictment charged that it was Ramirez who organized and financed the scheme to import and distribute marijuana from Mexico. The evidence which tends to prove the charge is set forth in the margin.[8]

On appeal we view the evidence and all inferences reasonably drawn from the evidence in the light most favorable to the government. On the basis of the evidence set forth in the margin, we hold that a

---

**8.** The prosecution introduced the following evidence at trial to prove that Ramirez was a knowing participant in the criminal conspiracy:

a. The first meeting between any of the alleged conspirators was between Baerenwald and Ramirez in February, 1981. Baerenwald testified that Ramirez asked his assistance in locating a pilot and airplane to move some "merchandise," which Baerenwald understood to mean marijuana.

b. Two months later, in April 1981, Baerenwald introduced Reynolds to Ramirez. Ramirez insisted upon speaking to Reynolds alone.

c. On April 9, 1981, Reynolds met with William Miller and proposed that Miller steal a Cessna 404 airplane to be delivered to Mexico in exchange for marijuana. Reynolds testified during cross-examination that he told Miller that he was working for Roy Ramirez, though Reynolds denied at trial that he was in fact working for Ramirez. Miller testified that on this occasion Reynolds mentioned the name Roy a few times.

d. On April 20, 1981, Baerenwald met with Ramirez and received $3,000 from him. Baerenwald and Reynolds used the money to pay some of their personal bills. Sergeant McNight testified that he was surveilling Baerenwald and observed the transfer of money. Immediately following his meeting with Ramirez, Baerenwald met Reynolds and together they drove to the Long Beach airport where, according to Baerenwald's testimony, they examined various twin-engine aircraft "which could be used."

e. Also in April, Baerenwald's testimony shows that he contacted Ramirez in an effort to locate a ground man to unload "merchandise." Ramirez introduced Baerenwald to Peterson, whom Ramirez said could possibly fill the job.

f. On May 13, after the first airplane theft charged in the indictment, but before the second, Reynolds again met with Ramirez. Sergeant McNight testified that while on surveillance he saw Ramirez pointing out locations on an air chart to Reynolds. Later, on May 17, Sergeant McNight observed a second meeting between Reynolds and Ramirez which lasted approximately 50 minutes.

g. Miller testified that on May 20, he stole a second plane from Long Beach airport. Between May 20, 1981 and May 30, 1981, Reynolds and Miller made three trips to Mexico and each time loaded a shipment of marijuana. Miller testified that Reynolds used the names Roy or Ramirez at various points during these ten days, in conversations both with the men who delivered the shipments of marijuana in Mexico and with the "load man" who received the shipments in the United States. On the third trip from Mexico, on May 30, Miller and Reynolds were forced to make an emergency landing in Mexico. Miller testified that after returning to the United States, leaving the plane in Mexico, Reynolds called Roy Ramirez. Reynolds told Miller that Ramirez would try to recover the airplane so that the load would not be lost.

rational jury could have found beyond a reasonable doubt that a conspiracy existed as charged in the indictment, and that Ramirez knowingly participated in that conspiracy.

The convictions of appellant Reynolds on Count II and of appellant Ramirez on Counts I through VII are affirmed.

AFFIRMED.