961 F.2d 217
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jesse ARZATE, Defendant-Appellant.
 No. 89-50553.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Jan. 6, 1992.
April 27, 1992.
 
 Before POOLE, WIGGINS and LEAVY, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Appellant Jesse Arzate appeals his conviction and sentence for conspiracy to distribute cocaine (21 U.S.C. § 846), possession with intent to distribute cocaine (21 U.S.C. § 841(a)), and using a firearm in connection with a drug-trafficking crime (18 U.S.C. § 924(c)(1)). Arzate challenges his conviction on the grounds that the district court erred in denying his severance motion and in excluding certain evidence. He further argues that the convictions are barred because the government committed outrageous misconduct. As to his sentence, Arzate argues that the district court erred in raising his offense level for being an organizer or manager of the conspiracy. We have jurisdiction under 28 U.S.C. § 1291. We affirm.
 
 BACKGROUND
 
 3
 In 1988, the Drug Enforcement Agency (DEA) began an investigation into a drug conspiracy which eventually resulted in the conviction of Jesse Arzate. DEA undercover agent Ernest Halcon was introduced to Marcario Garcia by Jerry Ojada, a government informant in the city of Montebello, California. Garcia told Halcon that his organization controlled the cocaine traffic in the San Gabriel Valley and that they would sell Halcon as much cocaine as he wanted to buy. Following the initial meeting, Halcon discussed buying cocaine with Garcia over twenty times. At one point, Garcia even threatened Halcon's family.
 
 
 4
 On December 20, 1988, Garcia called Halcon and told him that he wanted to give Halcon a sample of the cocaine (one gram) he was proposing to sell. Later that evening, Halcon and another agent purchased the sample for one hundred dollars. On December 27, 1988, Garcia told Halcon that he no longer wanted to sell thirty kilograms of cocaine as first discussed. He told Halcon that he would rather start with a smaller transaction of ten kilograms. During the conversation, a man named Jesse got on the phone and told Halcon that he controlled the cocaine and that he would not sell thirty kilograms at one time. He told Halcon that larger transactions could follow the initial deal.
 
 
 5
 On January 4, 1989, Garcia told Halcon that he was ready to make the deal and that he wanted to see the money. Halcon met Garcia in Montebello and showed him one hundred thousand dollars. Garcia called Jesse and told him that he had seen the money and was ready to complete the deal. Halcon then got on the phone, and Jesse told him he would have to drive to Pomona and await further instructions. The cocaine was being delivered from another location and had not yet arrived.
 
 
 6
 After several delays, the cocaine finally arrived at the apartment complex where Jesse Arzate lived. Halcon went to the complex where he met Arzate and Garcia. As they went into the complex, Halcon noticed a bulge in Arzate's sweatshirt. Halcon believed that the bulge was a firearm. The group then went to a yellow Cadillac which had been driven by codefendant Marino-Biarreal. Arzate opened the trunk and removed a gymbag. There were nine brick-sized packages in the bag. Halcon was told that the tenth kilo of cocaine was in the apartment and that he would get it after he turned over the money. The group then walked back towards the entrance of the complex and Halcon gave the arrest signal. He then grabbed Garcia and yelled that Arzate had a gun. Halcon testified that he saw Arzate, who was standing near the car, bend over slightly and that he saw something fall to the ground. Later agents discovered a handgun underneath the car approximately seven feet from where Arzate was standing. No fingerprints were found on the gun.
 
 
 7
 Arzate was then charged with conspiracy to distribute cocaine, possession with intent to distribute cocaine, and use of a firearm in a drug trafficking crime. Prior to trial and later during the trial, Arzate made a motion to sever his trial from that of his codefendant Garcia. The district court denied the motions. After a jury trial, Arzate was convicted of all counts. The court sentenced him to 230 months and Arzate appealed timely.
 
 DISCUSSION
 I. SEVERANCE
 
 8
 Arzate argues that the district court improperly denied his severance motion. He sought severance on the theory that his defense was mutually exclusive with that of codefendant Garcia. We review the denial of a motion for severance for an abuse of discretion. United States v. Valles-Valencia, 811 F.2d 1232, 1238 (9th Cir.), as amended, 823 F.2d 381 (1987); United States v. Ramirez, 710 F.2d 535, 545 (9th Cir.1983).
 
 
 9
 A district court is obligated to grant severance only if the joint trial would significantly prejudice a defendant. See United States v. Escalante, 637 F.2d 1197, 1201 (9th Cir.), cert. denied, 449 U.S. 856 (1980). Such manifest prejudice occurs when the defenses of two codefendants are so antagonistic as to be considered mutually exclusive. Ramirez, 710 F.2d at 546. Mutually exclusive defenses exist where "acceptance of one party's defense will preclude the acquittal of the other party." Id.
 
 
 10
 Arzate's defense in this case was that he did not possess the handgun found by the police at the scene of the narcotics transaction. Garcia's defense was that Arzate coerced him into participating in the narcotics conspiracy. The jury could believe Garcia's coercion defense without finding that Arzate possessed the handgun. Conversely, the jury could have rejected both defenses and convicted both defendants. These defenses are not mutually exclusive because the jury's acceptance of Garcia's coercion defense would not have precluded Arzate's acquittal on the gun possession charge. See Valles-Valencia, 811 F.2d at 1238. It was not conceptually impossible for each defendant to have committed the crime he was accused of. Accordingly, the district court did not err in denying the severance motion.
 
 II. EXCLUDED EVIDENCE UNDER FRE 404(b)
 
 11
 A district court's decision whether evidence falls within the scope of the Federal Rule of Evidence 404(b) is a question of law which is reviewed de novo. United States v. Mundi, 892 F.2d 817, 820 (9th Cir.1989), cert. denied, 111 S.Ct. 1072 (1991). A district court's decision to admit evidence is reviewed for abuse of discretion. United States v. Soliman, 813 F.2d 277, 278 (9th Cir.1987). Similarly, a district court's decision to limit the scope of cross examination is reviewed for abuse of discretion. United States v. Changa, 901 F.2d 741, 743 (9th Cir.1990). Even where a trial court has abused its discretion, the reviewing court must determine whether the error was harmless beyond a reasonable doubt. Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986).
 
 
 12
 Arzate claims that the district court erred in not permitting him to bring out evidence of Garcia's restraining order during cross examination.[1] Arzate argues that the district court's refusal to permit cross examination on the subject denied him his fundamental right to put on a defense.
 
 
 13
 Under Fed.R.Evid. 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Rule 404(b) specifically prohibits propensity evidence. Arzate claims that the proffered evidence would have "demonstrate[d] Garcia's propensity for violence and establish the likelihood that he was carrying the gun." Arzate was clearly trying to use the evidence of the restraining order, evidence of a prior bad act, to show that Garcia was a violent person and likely to carry a gun. This is precisely the type of evidence 404(b) was intended to exclude. The district court did not err in refusing to allow Arzate to cross examine on this subject.
 
 
 14
 Arzate claims that the district court's action denied him the right to present a defense. While the Fourteenth Amendment does give Arzate the right to put on a defense, that right does not include the right to present inadmissible evidence. Furthermore, Arzate was permitted to put on other evidence which undermined Garcia's credibility and demonstrated his violent nature. On cross examination, Arzate's counsel elicited admissions from Garcia that he threatened to kill the undercover agent's family, that he had possessed drugs and that he had lied about the amount of the down payment on his car. Thus, Arzate's claim that he was denied the opportunity to present a defense is baseless.
 
 III. OUTRAGEOUS MISCONDUCT
 
 15
 The issue of whether police misconduct violates notions of constitutional due process is a question of law which is reviewed de novo. United States v. Wylie, 625 F.2d 1371, 1378 (9th Cir.1980), cert. denied, 449 U.S. 1080 (1981). As a defense, police misconduct is a close relative of entrapment and has been applied where the involvement of the police in the criminal activity "reach[es] such proportions as to bar [the] conviction of a predisposed defendant as a matter of due process." Hampton v. United States, 425 U.S. 484, 493 (1976) (Powell, J., concurring).
 
 
 16
 The due process defense, while potentially broad, is in fact extremely limited. See United States v. Bagnariol, 665 F.2d 877, 881-83 (9th Cir.1981), cert. denied, 456 U.S. 962 (1982) (tracing the development of the doctrine in this circuit as well as in the Supreme Court). Prosecution is barred only when the law enforcement misconduct "shocks the conscience [of the court]." United States v. Bogart, 783 F.2d 1428, 1438 (9th Cir.), vacated on reh'g, 790 F.2d 802 (1986). The Supreme Court has never reversed a criminal conviction on this ground. See United States v. Russell, 411 U.S. 423 (1973); United States v. Ramirez, 710 F.2d at 539. Only twice have circuit courts reversed a criminal conviction on this ground. Ramirez, 710 F.2d at 540. In each of those cases, the police engineered new crimes for the sole purpose of prosecuting the defendants. Id.
 
 
 17
 Arzate claims that the government committed outrageous misconduct because the confidential informant had sexual relations with Arzate's girlfriend after Arzate had been arrested. The use of the confidential informant did not violate Arzate's rights. There is no allegation that the informant manufactured the crime at the behest of the police for the sole purpose of prosecuting Arzate. Police involvement in the crime was minimal. The police had an undercover agent pose as a buyer to obtain the evidence necessary to arrest the dealer. Such conduct is standard procedure for law enforcement agencies and does not raise due process concerns. See Ramirez, 710 F.2d at 541; (the government may use artifice and deception to uncover evidence of criminal activity); see also id. (undercover police officers may supply contraband to a suspect to gain his confidence); United States v. Wylie, 625 F.2d at 1378 (government agents may use informants and pay them). Thus, the use of the confidential informant and the undercover agent in this case did not violate Arzate's due process rights.
 
 
 18
 Moreover, the fact that the informant had sexual relations with Arzate's girlfriend after he was arrested does not establish outrageous misconduct. In fact, this circuit has previously addressed a similar situation where the informant had sexual relations with the defendant. We held that such conduct was not so shocking and so outrageous as to violate the universal sense of justice. United States v. Simpson, 813 F.2d 1462, 1471 (9th Cir.), cert. denied, 484 U.S. 898 (1987). Likewise, the conduct of the informant in this case was not so outrageous as to amount to a violation of Arzate's due process rights.
 
 
 19
 IV. OFFENSE LEVEL INCREASE FOR BEING MANAGER OF CONSPIRACY
 
 
 20
 The issue of whether Arzate was a manager of the conspiracy under Sentencing Guideline section 3B1.1 is a question of fact that is reviewed under the clearly erroneous standard. United States v. Mares-Molina, 913 F.2d 770, 773 (9th Cir.1990).
 
 
 21
 Arzate claims that there was no evidence which would support the district court's conclusion that he was an organizer or manager of the conspiracy within the meaning of section 3B1.1. Arzate attempts to analogize his case to Mares-Molina. In Mares-Molina, the defendant's offense level was increased because the district court found that he was a manager of the conspiracy. This court reversed, finding that the district court's conclusion was clearly erroneous as there were no facts which indicated that the defendant organized or controlled his coconspirators. The only fact presented was that the defendant was the owner of the warehouse in which the cocaine was off-loaded.
 
 
 22
 Arzate's analogy to Mares-Molina is inapposite. The government presented ample evidence demonstrating that Arzate organized and controlled his coconspirators. Arzate was introduced to the undercover agent as Garcia's superior. Arzate told the undercover agent that he controlled large quantities of cocaine. It was Arzate who refused to sell the agents the larger amount of cocaine they originally requested. It was Arzate who established the location where the drug sale was to take place, and when the cocaine delivery was late, it was Arzate who guaranteed that the cocaine would arrive quickly. Based on these facts, the district court was not clearly erroneous in finding that Arzate was an organizer or manager within the meaning of Sentencing Guideline section 3B1.1.
 
 CONCLUSION
 
 23
 Therefore, the judgment of the district court is AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Garcia's mother had obtained a restraining order against Garcia after he threatened her life. The district court ruled that the restraining order did not involve a firearm and was therefore irrelevant to the issue of whether Garcia possessed the gun