**Emil WENTZ and William Bering Jensen, Appellants,**

v.

**UNITED STATES of America, Appellee.**

**No. 15248.**

United States Court of Appeals Ninth Circuit.

April 19, 1957.

Rehearing Denied May 31, 1957.

**173**

Angus D. McEachen, Los Angeles, Cal., for appellants.

Laughlin E. Waters, U. S. Atty., Louis L. Abbott, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before STEPHENS, FEE and CHAMBERS, Circuit Judges.

CHAMBERS, Circuit Judge.

Wentz and Jensen[1] were indicted and convicted as a consequence of a fraudulent scheme wherein Frank X. Pommer and Selma H. Pommer were the victims. A federal case was made out of it by adding the charge that "for the purpose of executing the * * * scheme and artifice (the defendants) caused to be transmitted by means of interstate and foreign wire a signal (i.e. a Western Union telegram) and sound from the City and County of Los Angeles, California, within the Central Division of the Southern District of California to Dallas, Texas, thence to San Antonio, Texas, and thence to Mexico, District Federal, Republic of Mexico."

The "flim-flam" involved many of the usual facets. A fixed horse race, fantastic winnings. The solicitation to put up "good faith" or guarantee money. Then the victims put up and lose $24,000.

The testimony has been so excised, as was proper, that the only incident for consideration here is the telegram dispatched from Los Angeles and addressed to Mexico City. We do not know how it fitted in to the plan or scheme, or with certainty who actually sent it. But it is conceded that there was adequate testimony to convict the defendants if the telegram's "course" is covered by the applicable statutes.

The accused telegram, omitting Western Union symbols, is:

Los Angeles, Cal.
Nov. 22, 1955

"J. E. Walters
Hotel Reforma
Mexico, D. F., Mexico
"Leaving Wednesday 3:45; arriving Mexico 11:15 P.M. Love

"Selma"

We assume that "Selma" was the victim Selma Pommer. We suppose the defendants sent the telegram for her or caused her to send it. No point is offered questioning the message as the corpus of the corpus delicti.

The telegram went over Western Union lines to Dallas, Texas. There it took tangible form and was retransmitted by Western Union on a wire to its center in San Antonio. There it had a tangible form. From San Antonio it was dispatched by Western Union to Mexico City over a direct wire without interruption. The message again reproduced in tangible form at Mexico City was delivered there by the telegraph agency of the Government of Mexico. The telegraph line from San Antonio to Mexico City is of some importance. The wire is owned by the Western Union Company from San Antonio to a point on or about the international bridge over the Rio Grande River between Laredo, Texas, and Nuevo Laredo, Mexico. There it connects with a wire of the publicly owned Mexican telegraph agency. The wire runs continuously to

---

[1] Indicted with Wentz and Jensen was a third defendant named Schlising who was arrested in Texas with Jensen. Schlising made bail and failed to appear for the trial which began May 21, 1956, in Los Angeles. A severance for Schlising was granted. The trial proceeded as to Wentz and Jensen.

Mexico City. The impulses released on the wire by Western Union at San Antonio carry the message to Mexico City without interruption. In Mexico City the message is received and reduced to tangible form.[2] It is not material, but it may be assumed that a message out of Mexico City to Los Angeles would follow the same procedure exactly in reverse. It appears from the record that on such a message as is the focal point here a charge for the service is made by Western Union at Los Angeles. Later the amount is divided upon some accounting basis with the Mexican agency.

The section involved in the indictment, as it read at the time of the alleged offense, was as follows:

"§ 1343. Fraud by wire, radio or television

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of interstate wire, radio, or television communication, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both." 18 U.S.C.A. § 1343.

The section first appears in the 1952 Communications Act amendments. See 66 Stat. 711 at page 722.

Having its roots in the Communications Act of 1934, 48 Stat. 1064, one must be concerned with the definitions therein contained:

"Sec. 3. For the purposes of this Act, unless the context otherwise requires—

"(a) 'Wire communication' or 'communication by wire' means the transmission of writing, signs, signals, pictures, and sounds of all kinds by aid of wire, cable, or other like connection between the points of origin and reception of such transmission, including all instrumentalities, facilities, apparatus, and services (among other things the receipt, forwarding, and delivery of communications) incidental to such transmission.

\*　　\*　　\*　　\*　　\*　　\*

"(e) 'Interstate communication' or 'interstate transmission' means communication or transmission (1) from any State, Territory, or possession of the United States (other than the Philippine Islands and the Canal Zone), or the District of Columbia, to any other State, Territory, or possession of the United States (other than the Philippine Islands and the Canal Zone), or the District of Columbia, (2) from or to the United States to or from the Philippine Islands or the Canal Zone, insofar as such communication or transmission takes place within the United States, or (3) between points within the United States but through a foreign country; but shall not include wire communication between points within the same State, Territory, or possession of the United States, or the District of Columbia, through any place outside thereof, if such communication is regulated by a State commission.

---

2. Apparently the electric impulse on the wire from Los Angeles is received by an automatic machine at Dallas which makes a 'reperforation" on a tape. (Probably, the first perforation is made by the sending machine in Los Angeles.) The reperforation at Dallas is run through another automatic machine which transmits it to San Antonio. It would seem that at San Antonio the message comes in over an automatic machine called a printer. This printer writes out the message that goes into the Western Union files. Also, there is a reperforation at San Antonio which is used for retransmission through another automatic machine to Mexico City.

"(f) 'Foreign communication' or 'foreign transmission' means communication or transmission from or to any place in the United States to or from a foreign country, or between a station in the United States and a mobile station located outside the United States." 47 U.S.C.A. § 153.

From the beginning of their legal troubles these two defendants have persistently and repeatedly asserted that their act was a foreign communication. They say that what they did was not proscribed by the statutes of the United States until 1956 [3] when Section 1343, Title 18, was added to read as follows:

"§ 1343. Fraud by wire, radio, or television

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

If the addressee had been in San Antonio the defendants necessarily would concede they had offended. They have found a loophole, they believe. And if they have found one, they are entitled to go free. It is not for a court to stretch a statute to cover something not covered. A court should not strain either way. It must seek the plain natural meaning as best it can.

The government practically admits that if the message had crossed the California line at San Diego and thence across Mexico into Mexico City then there would be no violation. That would be a foreign communication: a foreign transmission without an interstate aspect. And this court believes such an interpretation was probably correct prior to the 1956 amendments.

Inasmuch as § 1343 of the Criminal Code came into being in 1952 as a Communications Act amendment, naturally the definitions of the 1934 Communications Act are germane. The 1952 act proscribes transmission "by means of interstate wire" for the purpose of executing the fraudulent scheme.

It seems clear that Sec. 3(a), supra, indicates that more elements may be required for a communication than for a transmission. Communication may imply receipt by the addressee, or at least arrival of the message at the destination. Transmit, we take it, means to send across. And there were really three transmissions of this message: (1) The interstate transmission Los Angeles to Dallas. (2) The retransmission intrastate in Texas from Dallas to San Antonio. (3) The foreign transmission from San Antonio to Mexico City. Therefore, when the message ceased to be an electric signal at Dallas and took on tangible form for retransmission it would appear that the corpus delicti of the crime was complete.[4]

It may be argued that this construction cuts across subdivision (e) of Section 3, supra; that in subd. (e), when it is said, " 'Interstate communication' or 'interstate transmission' means, communication or transmission from any State * * * to any other State," necessarily interstate communication and transmission are identical. But this court says Section 3(e) means the same as if it read "interstate communication means interstate communication from any state to any other state and interstate transmission means interstate transmission from any state to any other state." We believe

3. A time after the crime, if any, was committed.

4. An alternative possible concept is that there was just one transmission from Los Angeles to San Antonio. But the chain of transmission was in any event broken at San Antonio, if not at Dallas. The legal result is the same as if the chain of transmission first broke at Dallas.

## 176

that the design of the statute was to proscribe the interstate use of wires. This was done with the message which is the hub of this case.

Defendants bear down heavily on the proposition that foreign commerce is not interstate commerce; ergo, a foreign communication which includes interstate aspects is not an interstate communication. They rely heavily on the case of Border Pipe Line Co. v. Federal Power Commission, 84 U.S.App.D.C. 142, 171 F.2d 149. There the Border Company operated a natural gas pipeline wholly in Texas. It delivered gas at a point on the Texas side of the border to a Mexican consumer who took the gas on in his own pipeline to Mexico where he used it in his industry. The natural gas act was limited to gas in interstate commerce. Obviously, the Border Company's activities would be hard to drag in under the term interstate commerce. But we do not read that case as reaching the question that would have arisen if the gas had flowed from Texas to New Mexico and thence across to Mexico.

In view of the 1956 amendment to § 1343, there may not be too many more cases coming to construe the section as it was adopted in 1952. Many variations of the same facts under the 1952 act, we do not consider we have reached. Among them: (1) Suppose the Los Angeles operator sent the impulses for the message here over the identical lines (with the same division of ownership of lines and division of service fee) without interruption to Mexico City. (2) Suppose Western Union owned the same line all of the way over the same course and the message was sent uninterrupted from Los Angeles to Mexico City.

█ It is a cliche to say that legislation is "inartfully drafted." It does appear, if the defendants' message had had no interstate aspects, that there was an obvious loophole in the statute. But straining neither to hold tight nor to open a gate, it is this court's best judgment that the loophole was not big enough for these defendants. Interstate transmission was proscribed. They had one.

█ The defendant Jensen has a second point. In the district court he made a timely objection which asserted that the court had no personal jurisdiction over him. Four days after his indictment on May 14, 1956, he moved to dismiss the indictment upon the basis of an affidavit he made and filed. It said: That he was seized and detained in Mexico City on January 17th by Mexican authorities. In Mexico he was at all times denied an attorney. No proceedings were ever held for him in Mexico. He was transported by automobile (by whom not stated) from Mexico City through Nuevo Laredo, Mexico, to Laredo, Texas, where he was turned over to "certain agents of the United States government." Thence he was taken to the United States Commissioner.

As noted, the motion requested the indictment be dismissed because of lack of personal jurisdiction, which lack purportedly arose out of the events related above. The non sequitur of the motion (dismissal of indictment because no personal jurisdiction yet) we shall ignore. We do, however, believe we should notice that defendant Jensen's counsel misstates the record facts when in his brief he says, "Personal jurisdiction of appellant was acquired by the federal court through the illegal acts of federal officers."

No illegal act of a United States officer is related by Jensen. In the affidavit no action of officers of the United States begins before the defendant is brought to them in the United States. Therefore, the charge, if true, must be that the defendant was denied "due process" in Mexico by Mexicans. If true, that is no legal concern of an American court.

When American officers participate in an abduction from a foreign country (beyond merely receiving a man pushed out of a foreign country) there will then be time to consider whether the forced confession cases relied on by Jensen have some effect on jurisdiction over the person, and, if so, what effect.

The judgments of conviction are affirmed.