**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Wilfried VAN CAUWENBERGHE,
Defendant-Appellant.**

**No. 86–5028.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 5, 1987.

Decided April 10, 1987.

Amended Sept. 3, 1987.

Robert L. Brosio, Los Angeles, Cal., and John D. Arterberry, Stephen J. Shine, Ellyn Marcus Lindsay, Washington, D.C., for plaintiff-appellee.

John G. Kester, Robert S. Litt, Washington, D.C., for defendant-appellant.

Before NELSON and BEEZER, Circuit Judges, and LEAVY,* District Judge.

## AMENDED OPINION

NELSON, Circuit Judge:

Wilfried Van Cauwenberghe, a citizen of Belgium, appeals from a criminal conviction on one count of wire fraud under 18 U.S.C. § 1343 (1982) and one count of interstate transportation of a victim of fraud under 18 U.S.C. § 2314 (1982). Following a jury trial, Van Cauwenberghe was convicted of participating with two Americans in a scheme to defraud a Belgian investment broker and a family-owned Belgian corporation of 3.6 million dollars relating to the purchase and development of a condominium tract near Kansas City. Van Cauwenberghe argues that numerous errors were made requiring reversal of his extradition from Switzerland, his indictment, and his trial. In addition, Van Cauwenberghe argues that the district court should have returned certain property to him because it was seized illegally, and that his sentence was improper. This court has jurisdiction under 28 U.S.C. § 1291. We affirm.

### FACTS

Between 1979 and 1981, Van Cauwenberghe participated with two Americans, Alan H. Blair and Gerald L. Bilton, in a scheme to defraud Roger Biard, a Belgian investment broker, and a Belgian corporation owned by members of the Vanden Stock family, of 3.6 million dollars relating to the purchase and development of Concorde Bridge Townhouses, an apartment complex near Kansas City, Missouri. Van Cauwenberghe, Blair, and Bilton were indicted on seven counts, including three counts of wire fraud (18 U.S.C. § 1343), three counts of interstate transportation of a victim of fraud (18 U.S.C. § 2314), and one count of conspiracy to commit fraud (18 U.S.C. § 371), in October 1984. The government learned that Van Cauwenberghe, a Belgian citizen, would be traveling from Brussels to Geneva on a brief business trip and, on November 20, 1984, filed a provisional arrest request with Swiss authorities pursuant to Article VI of the Treaty on Extradition, May 14, 1900, United States-Switzerland, 31 Stat. 1928, T.S. No. 354 ("Treaty").[1] Van Cauwenberghe was arrested by Swiss authorities as he stepped off his plane in Geneva on January 14, 1985.

On January 15, 1985, Swiss authorities also seized Van Cauwenberghe's assets at Credit Suisse and Fides Societe Fiduciare, Geneva, pursuant to the government's re-

---

* Honorable Edward Leavy, United States District Judge, District of Oregon, sitting by designation.

1. The government could not proceed against Van Cauwenberghe in Belgium because Belgium does not extradite its nationals.

quest under Article XII of the Treaty. These assets consisted of two stock certificates dating from 1973 in ABAMAR and BATIMAR, Panamanian land-holding corporations in which Van Cauwenberghe held 6.293% and 19.659% interests, respectively, and eighty-two unrelated documents. Van Cauwenberghe's Swiss attorney made a showing that Van Cauwenberghe had not invested any money in ABAMAR or BATIMAR since 1973, at least six years before the allegedly fraudulent acts for which he was being held. As a result, Swiss authorities agreed to release the BATIMAR certificate on February 7, 1985. The government, however, renewed its request that all stock certificates in Van Cauwenberghe's Swiss accounts be seized, and, on March 21, 1985, Swiss authorities acquiesced and again seized the BATIMAR certificate. The government subsequently filed a formal extradition request on March 12, 1985.

Van Cauwenberghe challenged his extradition before the Swiss courts including the Swiss Federal Tribunal, Switzerland's highest court, which, on September 25, 1985, held that Van Cauwenberghe was extraditable under the Treaty for all of the offenses charged except conspiracy. Accordingly, Van Cauwenberghe was extradited to the United States on September 26, 1985.

The trial of Van Cauwenberghe, Blair, and Bilton began in Los Angeles on November 19, 1985. Prior to trial, the district court denied Van Cauwenberghe's motion for a severance and limited trial to counts one (interstate transportation of a victim of fraud) and two (wire fraud) (the "Biard counts"),[2] severing counts three through six (the "Vanden Stock counts") for later disposition, and dismissing count seven (conspiracy). The district court also denied Van Cauwenberghe's motions to dismiss the indictment due to improper extradition, to dismiss count two for failure to state an interstate offense, and for transfer of venue to Washington, D.C. In addition, the

district court denied Van Cauwenberghe's motion under Fed.R.Crim.P. 41(e) to release his stock certificates in ABAMAR and BATIMAR, and ordered all property seized by Swiss authorities deposited into the registry of the court pending the outcome of the trial.

The theory of Van Cauwenberghe's defense at trial was that he was merely an innocent pawn in the fraudulent scheme, not a culpable participant. During trial, Roger Vanden Stock, a director of the family-owned Belgian corporation, was allowed to testify about communications between the Vanden Stock family and defendants, over Van Cauwenberghe's objections that such testimony was unduly prejudicial and improper because trial was limited to the two Biard counts. The court also allowed extensive testimony, over Van Cauwenberghe's objections, regarding Blair's misrepresentations to both Biard and the Vanden Stocks made outside the presence of Van Cauwenberghe.

The jury found all three defendants guilty on both counts. Van Cauwenberghe's motions for judgment of acquittal and for a new trial were denied, and judgment for the government was entered on January 22, 1986. On motions by the government, the district court dismissed the Vanden Stock counts against all defendants and agreed to retain the stock certificates until sentencing. The district court sentenced Van Cauwenberghe to a $10,000 fine and one year and one day in custody on the first count, crediting him for 373 days already served in pretrial confinement, and to a $1,000 fine and a five-year probation period on the second count. As conditions of probation on count two, the district court ordered Van Cauwenberghe (1) to make restitution of $458,-373.89 to Roger Vanden Stock and $34,-501.26 to Roger Biard; (2) not to engage in any real estate transactions, except to liquidate his property, or wire transfers, except

---

**2.** The indictment alleged a scheme to defraud both Roger Biard and the Vanden Stock family and broke down into seven counts:

    Count I—18 U.S.C. § 2314 (Biard)
    Count II—18 U.S.C. § 1343 (Biard)
    Count III—18 U.S.C. § 2314 (Vanden Stock)

    Count IV—18 U.S.C. § 2314 (Vanden Stock)
    Count V—18 U.S.C. § 1343 (Vanden Stock)
    Count VI—18 U.S.C. § 1343 (Vanden Stock)
    Count VII—18 U.S.C. § 371 (Biard & Vanden Stock)

to his family; and (3) not to leave the United States until the restitution is paid.[3]

Because the 373 days of pretrial confinement for which Van Cauwenberghe received credit exceeded his custodial sentence on count one, Van Cauwenberghe immediately began his probation. The stock certificates were released into the joint custody of the government and Van Cauwenberghe for liquidation. The amount realized upon liquidation was ordered to be deposited back into the registry of the district court. The excess, up to $600,000 above the $492,875.15 restitution, realizable upon the eventual sale of the certificates, was attached on February 6, 1986, pursuant to a civil action filed by Biard against Van Cauwenberghe in the district court.

Van Cauwenberghe timely appealed on January 31, 1986. Neither Blair nor Bilton, co-defendants below, is a party to this appeal.

## DISCUSSION

### I. EXTRADITION

The district court's decision that an offense is an extraditable crime presents a legal question subject to de novo review by this court. *Quinn v. Robinson*, 783 F.2d 776, 791–92 (9th Cir.), *cert. denied*, — U.S. ——, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986).

■ The right "to demand and obtain extradition of an accused criminal is created by treaty." *Id.* at 782; *see Factor v. Laubenheimer*, 290 U.S. 276, 287, 54 S.Ct. 191, 193, 78 L.Ed. 315 (1933). The offense complained of must ordinarily, therefore, be listed as an extraditable crime in the treaty. *Quinn*, 783 F.2d at 791. In addition, "under the doctrine of 'dual criminality,' an accused person can be extradited only if the conduct complained of is considered criminal by the jurisprudence or

under the laws of both the requesting and requested nations." *Id.* at 783; *In re Extradition of Russell*, 789 F.2d 801, 803 (9th Cir.1986). This dual criminality requirement has been expressly incorporated into the Treaty. *See* Treaty, art. II, 31 Stat. at 1929, T.S. No. 354, at 2. To satisfy this "dual criminality" requirement,

> "[t]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions."

*Russell*, 789 F.2d at 803 (quoting *Collins v. Loisel*, 259 U.S. 309, 312, 42 S.Ct. 469, 470–71, 66 L.Ed. 956 (1922)).

As a matter of international comity, "[t]he doctrine of 'specialty' prohibits the requesting nation from prosecuting the extradited individual for any offense other than that for which the surrendering state agreed to extradite." *Quinn*, 783 F.2d at 783. However, since the doctrine is based on comity, its "protection exists only to the extent that the surrendering country wishes." *United States v. Najohn*, 785 F.2d 1420, 1422 (9th Cir.) (per curiam), *cert. denied*, — U.S. ——, 107 S.Ct. 652, 93 L.Ed.2d 707 (1986). Therefore, the " 'extradited party may be tried for a crime other than that for which he was surrendered *if the asylum country consents.*' " *Id.* (quoting *Berenguer v. Vance*, 473 F.Supp. 1195, 1197 (D.D.C.1979)); *see* M. Bassiouni, *International Extradition* ch. VII, at 6–11 (1983).

■ Van Cauwenberghe argues that his extradition was improper because the Treaty does not identify wire fraud and interstate transportation of a victim of fraud as extraditable offenses. The Treaty does not expressly name these specific offenses but

---

**3.** Upon Van Cauwenberghe's emergency motion to modify the conditions of his probation so as to allow him to travel to his home in Belgium, a panel of this court ordered a limited remand to the district court on December 31, 1986. On February 17, 1987, the district court entered an order in which it found that (1) Van Cauwenberghe has relinquished sufficient property to pay the restitution in due course; (2) Van Cauwenberghe has irrevocably transferred full title to the property so that he cannot regain control over it if allowed to return to Belgium; and (3) there is no further probationary purpose to be served by requiring Van Cauwenberghe to remain in the United States.

includes "obtaining money or other property by false pretenses [and] receiving money ... knowing the same to have been ... fraudulently obtained." Treaty, art. II (6), 31 Stat. at 1930, T.S. No. 354, at 3. Moreover, the government insists that Van Cauwenberghe's argument is foreclosed by the Swiss Federal Tribunal's decision because "determination of whether a crime is within the provisions of an extradition treaty is within the sole purview of the requested state," citing *Johnson v. Browne*, 205 U.S. 309, 316, 27 S.Ct. 539, 540, 51 L.Ed. 816 (1907), and *McGann v. U.S. Bd. of Parole*, 488 F.2d 39, 40 (3d Cir.1973) (per curiam), *cert. denied*, 416 U.S. 958, 94 S.Ct. 1974, 40 L.Ed.2d 309 (1974). We agree.

*Johnson* involved an extradition request by the United States to Canada. The Canadian government determined that one of the offenses for which extradition was sought, conspiring to defraud the government, was not a form of fraud provided for in the subdivision of the article of the treaty listing extraditable fraud offenses. *Johnson*, 205 U.S. at 312, 27 S.Ct. at 540. The Supreme Court held that "[w]hether the crime came within the provision of the treaty was a matter for the decision of the Dominion authorities, and such decision was final by the express terms of the treaty itself." *Id.* at 316, 27 S.Ct. at 540 (citing to Article II of the treaty). Article II of the treaty in *Johnson* dealt only with offenses of a political character and expressly stated that "[i]f any question shall arise as to whether a case comes within the provisions of this article, the decision of the authorities of the government in whose jurisdiction the fugitive shall be at the time shall be final." *Id.* at 319 n. 1, 27 S.Ct. at 542 n. 1.

■ Because of this language in the *Johnson* treaty, Van Cauwenberghe argues that the holding in *Johnson* should be read narrowly. We believe, however, that the *Johnson* holding need not be read narrowly and that the first half of the sentence makes a broader statement regarding the proper deference to be accorded a surrendering country's decision on extraditability. The Canadian government's deci-

sion was not that the offense was non-extraditable because it was of a political character, a position that might have justified a narrower reading of *Johnson*. Instead, it maintained that the offense did not fall within the treaty's category of extraditable fraud offenses. *Id.* at 312, 27 S.Ct. at 540. Thus, we believe that the first half of the sentence addressed the proper deference to be accorded a surrendering country's decision as to whether a particular offense comes within a treaty's extradition provision.

In *McGann*, the Third Circuit also construed *Johnson* broadly. *McGann* involved the propriety of an extradition from Jamaica in which the Jamaican court held a parole violater extraditable under its treaty with the United States. The *McGann* court found the *Johnson* language controlling: "The holding of Johnson v. Browne ... precludes any review of the Jamaican court's decision as to the extraditable nature of the offense...." *McGann*, 488 F.2d at 40. We agree with the Third Circuit's reading of *Johnson*. According deference to the surrendering country's decision as to extraditability already underlies the related "doctrine of specialty." It would render that doctrine practically meaningless to hold that courts cannot try an extradited party for offenses other than those for which the surrendering government agreed to extradite, but need not defer to the surrendering government's threshold decision as to whether an offense is extraditable.

We therefore defer to the Swiss Federal Tribunal's decision as to Van Cauwenberghe's extraditability under the Treaty and hold that Van Cauwenberghe was properly extradited.

## II. THE INDICTMENT

■ Van Cauwenberghe argues that count two of his indictment should have been dismissed because it was self-contradictory and failed to state an offense. Count two of Van Cauwenberghe's original indictment incorporates the allegations in count one relating to the fraudulent scheme and states:

2. On or about December 6, 1979, within the Central District of California, the defendants ALAN H. BLAIR, GERALD L. BILTON and WIELFRIED [sic] VAN CAUWENBERGHE, for the purpose of executing the aforesaid scheme and artifice, did cause to be transmitted in interstate commerce, signs, signals, and sounds by means of wire communications, that is, a telex between Geneva, Switzerland, and Los Angeles, California, directing the transfer of $1 million fraudulently obtained from Roger Biard to an account in the name of Hexagonal Valley, N.V., at Manufacturer's Bank, Los Angeles, California.

Van Cauwenberghe argues that this count is self-contradictory because such a telex would be *only* in foreign commerce, citing *Wentz v. United States*, 244 F.2d 172, 175 (9th Cir.), *cert. denied*, 355 U.S. 806, 78 S.Ct. 49, 2 L.Ed.2d 50 (1957). We disagree.

In *Wentz*, an indictment charging a telex transmission "by means of interstate and foreign wire" expressly stated its origin in Los Angeles and the path of its transmission through Dallas and San Antonio, Texas, to Mexico City, Mexico. *Id.* at 173. The wire fraud statute in force when the indictment was issued (an early version of 18 U.S.C. § 1343) proscribed only transmissions by interstate wire. *Id.* at 174. Because the telex originated in Los Angeles and terminated in Mexico City, defendants insisted that this was solely foreign commerce, relying on *Border Pipe Line Co. v. Federal Power Commission*, 171 F.2d 149 (D.C.Cir.1948). We held, however, that the telex was transmitted in interstate commerce under the wire fraud statute because its path included the interstate transmission from Los Angeles to Dallas. *Wentz*, 244 F.2d at 176. With respect to *Border Pipe*, we stated that "we do not read that case as reaching the question that would have arisen if the gas had flowed from Texas to New Mexico and thence across to Mexico." *Id.*

In our case, evidence at trial demonstrated that the telex between Geneva and Los Angeles which formed the basis of count two actually followed a path consisting of three transmissions: (1) a foreign transmission from Geneva to New York City; (2) an intra-city transmission across New York City; and (3) an interstate transmission from New York City to Los Angeles. Thus, like the path of the telex in *Wentz*, the path of this telex also included an interstate transmission. This was not, therefore, "a foreign transmission without an interstate aspect," *id.* at 175, as alleged by Van Cauwenberghe. The only relevant difference between *Wentz* and our case is that in *Wentz* the path of the telex was expressly described in the indictment and labeled a transmission in interstate *and* foreign commerce, whereas here only the origin and end of the telex were described and only interstate commerce was indicated.

Van Cauwenberghe argues that the differences in description and labeling are determinative. However,

an indictment is not to be read in a technical manner, but is to be construed according to common sense with an appreciation of existing realities. It must be read to include facts which are necessarily implied by the allegations made therein. Even if an essential averment in an indictment is faulty in form, if it may by fair construction be found within the text, it is sufficient.

*United States v. Anderson*, 532 F.2d 1218, 1222 (9th Cir.) (citations omitted), *cert. denied*, 429 U.S. 839, 97 S.Ct. 111, 50 L.Ed.2d 107 (1976). The existing reality is that the telex that formed the basis for count two, while originating in Geneva and terminating in Los Angeles, actually included a transmission in interstate commerce precisely as charged in the indictment. Therefore, Van Cauwenberghe's argument that the telex described in count two could only be in foreign commerce is incorrect.

■ Since Van Cauwenberghe was tried and convicted for a telex that was transmitted in interstate commerce as charged, this is not a case in which Van Cauwenberghe was convicted "based on an offense that is different from that alleged in the grand jury's indictment." *United States v. Miller*, 471 U.S. 130, 142, 105 S.Ct. 1811, 1818,

85 L.Ed.2d 99 (1985). This is also not a case, as alleged by Van Cauwenberghe, in which the indictment was altered by the district court. The district court correctly instructed the jury that count two stated a transmission that touched both foreign and interstate commerce and that it could base a finding of guilt under either theory. Therefore, count two of the indictment properly stated an offense for which Van Cauwenberghe was tried and convicted.

## III.  ALLEGED ERRORS AT TRIAL

We review the district court's decisions with respect to severance and admissibility of evidence under an abuse of discretion standard. *Maddox v. City of Los Angeles,* 792 F.2d 1408, 1412 (9th Cir.1986); *United States v. Ramirez,* 710 F.2d 535, 545 (9th Cir.1983). We will not reverse for an abuse of discretion unless we have "a definite and firm conviction that the court below committed an error." *Maddox,* 792 F.2d at 1412.

### A.  SEVERANCE

■ Ordinarily, "defendants jointly charged are to be jointly tried." *Ramirez,* 710 F.2d at 545; *United States v. Escalante,* 637 F.2d 1197, 1201 (9th Cir.), *cert. denied,* 449 U.S. 856, 101 S.Ct. 154, 66 L.Ed.2d 71 (1980). "Whether severance is necessary is within the sound discretion of the district court." *Ramirez,* 710 F.2d at 545; *United States v. Gee,* 695 F.2d 1165, 1169 (9th Cir.1983). A trial judge may order a severance if it appears that a defendant may be significantly prejudiced by a joint trial with his codefendants. *See Escalante,* 637 F.2d at 1201.

■ In order to prove that the district court abused its discretion in denying a motion for severance, the moving party must show that joint trial was " 'so prejudicial that the trial judge could exercise his discretion in only one way.' " *United States v. Arbelaez,* 719 F.2d 1453, 1460 (9th Cir.1983), *cert. denied,* 467 U.S. 1255, 104 S.Ct. 3543, 82 L.Ed.2d 847 (1984) (quoting *Escalante,* 637 F.2d at 1201). " 'The party seeking reversal of a decision denying severance ... has the burden of proving

"clear," "manifest," or "undue" prejudice from the joint trial. The defendant must prove that the prejudice was of such magnitude that he was denied a fair trial.' " *Id.* (quoting *Escalante,* 637 F.2d at 1201) (citations omitted).

Van Cauwenberghe argues that the district court's denial of his motion for severance denied him a fair trial because (1) he was unable to obtain exculpatory testimony from Monique Mat, wife of co-defendant Blair and (2) joint trial with Blair allowed the Government to introduce into evidence statements by Blair that would have been inadmissible against Van Cauwenberghe in a separate trial. We disagree.

■ First, Van Cauwenberghe insists that Monique Mat would have offered exculpatory testimony on his behalf in a separate trial, but that exercise of her marital privilege not to testify in the joint trial prevented the introduction of such testimony. However, the testimony Van Cauwenberghe claims Mat would have given—that a $271,000 wire transfer that Van Cauwenberghe received from Blair was in repayment of an earlier loan to her—is not subject to the marital privilege, which "is not available unless the anticipated testimony 'would in fact be adverse' to the nonwitness spouse." *In re Martenson,* 779 F.2d 461, 463 (8th Cir.1985) (quoting *United States v. Smith,* 742 F.2d 398, 401 (8th Cir.1984)). We do not believe that testimony that Blair's wire transfer to Van Cauwenberghe was in repayment of Mat's loan would have been adverse in any way to Blair's interests in the proceedings. Moreover, "blanket assertions of the privilege are not favored. '[T]he privilege is not a general one. It must be asserted as to particular questions.' " *Id.* (quoting *Smith,* 742 F.2d at 401) (citation omitted). Joint trial, therefore, did not prevent Mat from testifying on Van Cauwenberghe's behalf and exercising her marital privilege not to testify in response to any particular questions that might have elicited a response adverse to Blair's interests.

■ This conclusion is consistent with our holding in *United States v. Vigil,* 561

F.2d 1316 (9th Cir.1977) (per curiam). In *Vigil*, we held that the district court should have severed trial to allow a defendant to obtain certain exculpatory evidence from a co-defendant witness who could not be compelled to testify in a joint trial because of the privilege against self-incrimination. *Id.* at 1317–18. Van Cauwenberghe asserts that the *Vigil* rule is invoked in his case merely because a foreign witness beyond the court's subpoena power refused to testify unless trial was severed. We do not read *Vigil* as conferring on foreign witnesses a blanket power to dictate whether trials should be severed, regardless of whether the witness could properly assert an evidentiary privilege.

■ Second, testimony regarding Blair's misrepresentations to Biard and members of the Vanden Stock family outside of Van Cauwenberghe's presence would arguably have been admissible even in a separate trial as probative of the fraudulent scheme underlying the charges. If not, the test is " 'whether the jury can reasonably be expected to compartmentalize the evidence as it relates to separate defendants in light of its volume and limited admissibility.' " *Ramirez*, 710 F.2d at 546 (quoting *United States v. Brady*, 579 F.2d 1121, 1128 (9th Cir.1978), *cert. denied*, 439 U.S. 1074, 99 S.Ct. 849, 59 L.Ed.2d 41 (1979)). "A variety of factors can be relevant to this determination depending upon the facts of the particular case." *Id.*

■ In this case, there is no claim that Van Cauwenberghe's and Blair's defenses were mutually exclusive. "Only where the acceptance of one party's defense will preclude the acquittal of the other party does the existence of antagonistic defenses mandate severance." *Id.* Van Cauwenberghe only claims that he suffered from aspersions of guilt by association with the more culpable Blair. However, the mere fact that a criminal defendant is jointly tried with a more culpable co-defendant is not alone sufficient to constitute an abuse of the district court's discretion. *See Ramirez*, 710 F.2d at 547 (holding that joint trial with co-defendant against whom there was overwhelming evidence not prejudicial

when there was little chance of it "spill[ing] over"). We do not believe that evidence of Blair's guilt spilled over to Van Cauwenberghe. When, as here, the district court instructed the jury to consider the guilt or innocence of each co-defendant separately, in light of the evidence against that defendant, the jury is presumed to have obeyed. *United States v. Rasheed*, 663 F.2d 843, 854–55 (9th Cir.1981), *cert. denied*, 454 U.S. 1157, 102 S.Ct. 1031, 71 L.Ed.2d 315 (1982); *Escalante*, 637 F.2d at 1202. Therefore, the district court did not abuse its discretion by denying Van Cauwenberghe's motion for a separate trial.

### B. VANDEN STOCK TESTIMONY

■ Van Cauwenberghe also argues that the district court abused its discretion in admitting the testimony of Roger Vanden Stock regarding communications between defendants and members of the Vanden Stock family and the ultimate transaction between Blair and the Vanden Stocks. This argument is meritless. The specific counts on which Van Cauwenberghe was tried clearly charged that the acts therein were in furtherance of a single scheme to defraud both Biard and the Vanden Stocks. The communications and transaction with the Vanden Stocks constituted "an integral part" of that scheme. *See United States v. Poston*, 727 F.2d 734, 740 (8th Cir.) ("[C]riminal activity is an integral part of the offense charged if it is 'so blended or connected with the one on trial as that proof of one incidentally involves the other or explains the circumstances thereof. . . .' ") (quoting *United States v. Miller*, 508 F.2d 444, 448–49 (7th Cir.1974)), *cert. denied*, 466 U.S. 962, 104 S.Ct. 2179, 80 L.Ed.2d 561 (1984). Roger Vanden Stock's testimony was clearly admissible, therefore, because it was highly probative of the fraudulent scheme alleged in the counts on which Van Cauwenberghe was tried.

### IV. SEIZURE AND RETENTION OF ASSETS

Van Cauwenberghe argues that the district court erred in denying his motion under Fed.R.Crim.P. 41(e) for the return of

the property that was seized from his Swiss accounts. He argues that the property was illegally seized under Article XII of the Treaty and under the fourth amendment of the United States Constitution. In addition, Van Cauwenberghe argues that the district court had no statutory or other legitimate basis on which to retain his property in order to ensure payment of restitution.

To prevail on a Rule 41(e) motion, a criminal defendant must demonstrate that (1) he is entitled to lawful possession of the seized property; (2) the property is not contraband; and (3) either the seizure was illegal or the government's need for the property as evidence has ended. *See Sovereign News Co. v. United States,* 690 F.2d 569, 577 (6th Cir.1982), *cert. denied,* 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983); *United States v. Hubbard,* 650 F.2d 293, 303 (D.C.Cir.1980); Fed.R.Crim.P. advisory committee note; 3 C. Wright, *Federal Practice and Procedure* § 673, at 761–65 (2d ed. 1982).

There is no dispute that Van Cauwenberghe was the rightful owner of the property at the time it was seized from his Swiss bank accounts.[4] However, he no longer owns the property. On limited remand from this court,[5] the district court found, and Van Cauwenberghe admits, that he irrevocably transferred full title to the property to his own attorney and counsel for the United States, acting jointly, to satisfy his restitution condition. Thus, although the district court may have been under a duty to return property that neither was contraband nor had any evidentiary value,[6] *see Hubbard,* 650 F.2d at 303 & n. 26, Van Cauwenberghe can no longer demonstrate that he is entitled to lawful possession of the property and, therefore, no longer satisfies the first requirement under Rule 41(e).

Van Cauwenberghe argues that the transfer of property was not made voluntarily, but was made at the order and direction of the district court. He contends that under these circumstances he should not be deemed to have waived his challenges to the legality of the seizure. We have considerable difficulty accepting the predicate of this argument. First, the record below shows that Van Cauwenberghe sought and willingly complied with the order, filed on January 23, 1986 after the district court entered the guilty verdict, in order that he be permitted to leave the country and return to Belgium. Under the terms of his probation, the district court required Van Cauwenberghe to remain in this country until he satisfied his restitutionary obligation. The order itself declares that counsel for Van Cauwenberghe and the government "jointly submit the foregoing proposed order and request approval by the Court." Order, Jan. 23, 1986, at 2.

Second, while Van Cauwenberghe's appeal was pending, he lodged an emergency motion in this court in which he argued strenuously that he should be permitted to return to Belgium (which does not extradite its nationals) because he had irrevocably transferred full title to the assets to his attorney and the government's counsel for liquidation to satisfy his restitutionary obligations. The motions panel remanded to the district court for further findings to ensure that an irrevocable transfer had in fact occurred and that the assets would cover his restitutionary obligation. The district court made such findings and concluded that, since the assets were sufficient, the defendant could return home. It thus comes as something of a surprise that, after the avowals in his affidavit accompanying the emergency motion, in his petition for rehearing the defendant is still claiming

---

4. The record does not indicate that the Swiss bank had any proprietary interest in the property, only that it served as a repository for safekeeping.

5. *See supra* note 3.

6. The stock certificates were not used as evidence, and nothing in the record indicates that they had any connection with the crimes committed or alleged. Indeed, the record shows that the certificates had remained dormant since 1973, well before the fraudulent scheme commenced.

entitlement to lawful possession of the assets.

In light of these circumstances, the record does not support Van Cauwenberghe's contention that he did not transfer title to the assets voluntarily. Absent a showing that the individual requesting return of property under Rule 41(e) is entitled to its lawful possession, the property may not be released to him. Fed.R.Crim.P. 41(e); *see United States v. King*, 528 F.2d 68, 69 (9th Cir.1975) (per curiam). Although Van Cauwenberghe remains the beneficial owner of the assets and any proceeds derived from their sale, he has not demonstrated entitlement to lawful possession of the assets. Return of the assets under Rule 41(e) is therefore inappropriate.

Even if we were to conclude that Van Cauwenberghe could substantiate his claim of lawful possession, we believe that we would reach the same result. Assuming that the property was illegally seized under the treaty and the fourth amendment, return of the property might nonetheless be barred by the existence of a civil writ of attachment filed against the property. *See United States v. Francis*, 646 F.2d 251, 263 (6th Cir.) (denying return of illegally seized property where state tax lien had been placed on the property), *cert. denied*, 454 U.S. 1082, 102 S.Ct. 637, 70 L.Ed.2d 616 (1981); *United States v. Freedman*, 444 F.2d 1387, 1388 (9th Cir.1971) (denying return of illegally seized property because of pending IRS lien); *Guerra v. United States*, 645 F.Supp. 775, 779–80 (C.D.Cal. 1986) (same). However, because of our holding above, we express no view on whether the seizure was illegal or whether the property would have been returnable to Van Cauwenberghe despite the civil writ of attachment. We do not hold that Van Cauwenberghe lacks standing to challenge the legality of the seizure; rather, resolution of that question is unnecessary to the disposition of his Rule 41(e) challenge on appeal.

## V. THE SENTENCE

The legality of a criminal sentence is subject to de novo review by this court.

*United States v. Schiek*, 806 F.2d 943, 944 (9th Cir.1986). Sentencing that falls within statutory limits, however, is left to the sound discretion of the district court and is reviewed under an abuse of discretion standard. *See United States v. Messer*, 785 F.2d 832, 834 (9th Cir.1986). Van Cauwenberghe argues that his sentence was improper because (1) he should not have been required to make restitution to Roger Vanden Stock; (2) the amount of restitution ordered was arbitrary and capricious; and (3) requiring him to remain in the United States was improper. We disagree.

The Federal Probation Act, 18 U.S.C. § 3651 (1982), authorizes district courts to require restitution to "aggrieved parties for actual damages or loss caused by the offense for which conviction was had" as a condition of probation. We have interpreted § 3651 to mean that "absent a fully bargained plea agreement, the sentencing court may not impose restitution of amounts beyond those alleged in the indictment counts on which conviction is had." *United States v. Whitney*, 785 F.2d 824, 825 (9th Cir.1986); *United States v. Black*, 767 F.2d 1334, 1344 (9th Cir.), *cert. denied*, 474 U.S. 1022, 106 S.Ct. 574, 88 L.Ed.2d 557 (1985). In this case, Van Cauwenberghe was tried and convicted only on the Biard counts, and there was no plea agreement. Therefore, Van Cauwenberghe argues, he should not have been required to make restitution beyond the Biard counts to Roger Vanden Stock.

We have interpreted § 3651, however, to allow restitution to aggrieved parties not named in counts for which probation is ordered. *See United States v. Orr*, 691 F.2d 431, 434 (9th Cir.1982) (stating that nothing in the language of § 3651 requires an interpretation "that restitution may not be ordered to a party not named in the count for which probation was ordered"). Moreover, the entire scheme to defraud Biard and the Vanden Stock family of 3.6 million dollars was alleged in the indictment counts for which Van Cauwenberghe was convicted. By specifying the total amount alleged to have been fraudulently obtained in the indictment, "the in-

dictment gave [defendant] fair notice of the damages the government intended to prove he caused his victims to suffer and placed a ceiling above which a restitution order would have been improper." *Schiek*, 806 F.2d at 944. The indictment thus put Van Cauwenberghe on notice that the government intended to prove his participation in a scheme to defraud both Biard and the Vanden Stocks of 3.6 million dollars. It was not improper, therefore, to impose restitution for both Biard and Vanden Stock.

The $492,875.15 restitution figure imposed on Van Cauwenberghe was set at 17.6% of the actual losses resulting from the fraudulent scheme.[7] This amount is much less than either the losses alleged in the indictment or the total actual losses proved at trial. Since joint and several liability for the entire actual loss could have been imposed on each defendant, *see United States v. Tzakis*, 736 F.2d 867, 870–71 (2d Cir.1984), the district court did not abuse its discretion by imposing this lower figure.

Finally, Van Cauwenberghe contends that the district court's condition that he remain in the United States until restitution is paid is improper. In response to our limited remand on Van Cauwenberghe's emergency motion, the district court found that Van Cauwenberghe's continuing presence in this country no longer serves any probationary purpose.[8] Thus, Van Cauwenberghe's probation may be modified to allow him to return to Belgium. Accordingly, we remand to the district court with instructions to consider modifying this condition of Van Cauwenberghe's probation.

Affirmed and remanded for modification of terms of probation.

---

**7.** The district court found that Van Cauwenberghe had received 17.6% of the proceeds from the fraudulent venture and based its restitution order on this finding.

**8.** *See supra* note 3.